The BANK OF SUSSEX COUNTY, Plaintiff,

v.

James J. SAXON, Comptroller of the Currency of the United States, Defendant,

and

Peoples National Bank of Sparta and Charles R. Howell, Commissioner of Banking and Insurance of the State of New Jersey, Intervenor.

Civ. A. No. 568–65.

United States District Court
D. New Jersey.

Feb. 16, 1966.

David M. Satz, Jr., U. S. Atty., by Barry D. Maurer, Asst. U. S. Atty., Irwin Goldbloom, Department of Justice, for

James J. Saxon, Comptroller of the Currency of the United States.

Schenck, Price, Smith & King, by Elmer S. King, Morristown, N. J., James F. Bell, Brian C. Elmer, of Pogue & Neal, Washington, D. C., for plaintiff.

Honig & Kovach, by Emanuel A. Honig, Franklin, N. J., for Peoples Nat. Bank of Sparta.

Arthur Sills, Trenton, by Marilyn Loftus Schauer, Newark, N. J., for Charles R. Howell, Commissioner of Banking and Insurance of the State of New Jersey.

WORTENDYKE, District Judge:

Plaintiff (hereinafter Sussex Bank) is a banking corporation duly chartered under the laws of the State of New Jersey. Its main office is in the Borough of Franklin, and it operates branches in the Borough of Sussex and in the Townships of Vernon and Andover in that State. The defendant (hereinafter Comptroller) is, and at all times hereto relevant, was, the Comptroller of the Currency of the United States, an agency of the Executive Branch of the Federal Government. The Peoples National Bank of Sparta, New Jersey (hereinafter Peoples Bank) is a national banking association, chartered by Comptroller, having its main office in the Township of Sparta, New Jersey where it commenced business on August 24, 1964.

On October 11, 1963 application was duly made in behalf of Sussex Bank to the New Jersey Commissioner of Banking and Insurance (hereinafter Commissioner) for permission to establish a branch of that institution in Wantage Township in the same county in which its main office is located. Following advices from the office of the Commissioner that its application for a branch had been tentatively approved pending an increase in its capitalization, Sussex Bank commenced consideration and exploration of available methods for the accomplishment of a stock increase plan submitted by the Bank's President to the Executive Committee of its Board of Directors on May 28, 1964, implemented by the action of its Board of Directors which authorized reduction of the par value of the Bank's stock from $10.00 to $5.00 per share, and a split of its outstanding stock on the basis two for one, consequently increasing the amount of the stock from 54,000 to 108,000 shares. The existing stockholders of the bank were given the privilege of purchasing one share at $25 per share for each five shares held by them, thus distributing an additional 21,600 shares to produce a new capital of $540,000. The Board's resolution authorized submission of the plan to a special meeting of the stockholders to be held in October or November, 1964.

On October 7, 1964 Peoples Bank applied to Comptroller for permission to establish a branch office in Wantage Township, New Jersey, at a location approximately two miles distant from an existing branch of the Sussex Bank in Sussex, and four miles from the main office of the Sussex Bank in Franklin. Peoples Bank was notified on October 26, 1964 that its application had been approved and on the following day moved a vehicular trailer onto the site for which it had sought permission for its branch, and commenced operation of a branch banking business therein which still continues. The Comptroller's letter of October 27, 1964, which enclosed a certificate of the same date authorizing it to establish the branch, confirmed the previous informal notice of the approval of its application.

Section 36(c) of the National Banking Act, as amended, 12 U.S.C. § 36(c) provides as follows:

"(c) A national banking association may, with the approval of the Comptroller of the Currency, establish and operate new branches: * * * (2) at any point within the State in which said association is situated, if such establishment and operation are at the time authorized to State banks by the statute law of the State in question

by language specifically granting such authority affirmatively and not merely by implication or recognition, and subject to the restrictions as to location imposed by the law of the State on State banks. * * * "

The statute law of New Jersey restricts the establishment of State bank branches. N.J.S.A. 17:9A–19, subd. B provides that

"No bank * * * shall establish or maintain a branch office which is located outside the municipality in which it maintains its principal office; except that a bank * * * may establish and maintain a branch office or offices anywhere in the same county as that in which it maintains its principal office * * * (3) when each proposed branch will be established in a municipality in which no banking institution has its principal office or a branch office."

Franklin, in which the main office of the Sussex Bank is located and Sparta, in which the main office of Peoples Bank is located are situate in Sussex, New Jersey, in which Wantage Township is also situate. Prior to October 27, 1964 there were no banking facilities in that Township. Therefore, under the provisions of 12 U.S.C. § 36(c) and of N.J.S.A. 17:9A–19, subd. B(3) only one branch, either of Sussex Bank or of Peoples Bank would be permissible in that Township.

Pending stockholder approval of Sussex Bank's capitalization increase, formal consent by Commissioner to its branch application was deferred. A meeting of the stockholders was noticed for November 5, 1964, for the purpose of that approval. Sussex Bank also applied to the Federal Reserve Board for permission to establish a branch office under Section 9 of the Federal Reserve Act, 12 U.S.C. § 321, as a member of the Federal Reserve System, and, after appropriate investigation, the Federal Reserve Bank of New York recommended to the Board of Governors of the Federal Reserve System that the application of the Sussex Bank for a branch in Wantage Township, New Jersey, be approved.

Sussex Bank first learned of the application of Peoples Bank from a National Bank Examiner, who called at the office of Sussex Bank on or about October 13, 1964. Sussex Bank protested verbally to the Examiner against Peoples Bank's application, and advised him of the pendency of its own application for a branch in the same Township. Sussex Bank also protested to the Regional Comptroller of the Currency in New York City by letter dated October 16, 1964. In his acknowledgment of receipt of that letter, the Regional Comptroller assured Sussex Bank that the "[C]omments and objections [contained in the protesting letter] will be carefully considered before a decision in the matter is reached." No opportunity to be heard on these protests was offered to Sussex Bank by Comptroller. The New Jersey Deputy Commissioner also protested the Peoples Bank application to the Regional Comptroller by letter of October 13, 1964, which advised that the application of the Sussex Bank to the Commissioner had already been approved contingent upon raising the additional capital, and that its Board of Directors had already voted to present the matter to the stockholders. Despite the foregoing, the application of Peoples Bank was approved by the Comptroller's Office, and on October 27, 1964 Peoples Bank commenced business from a branch office in a vehicular trailer located upon a supermarket parking lot in Wantage Township. Upon advice by Sussex Bank to the New Jersey Commissioner of the operation of the branch by Peoples Bank, the President of Sussex Bank was assured by the Commissioner that the approval of the Peoples Bank operation constituted a violation of the working agreement existing between the respective offices of the Commissioner and Comptroller, and that the latter would be urged to rescind the certificate which had been issued.

In its duly verified complaint in this Court, the Sussex Bank prays that the certificate issued on October 27, 1964 by

the Comptroller of the Currency of the United States to the Peoples National Bank of Sparta, New Jersey authorizing that bank to establish a branch office in Wantage Township, New Jersey be declared to have been issued in contravention of law and to be null and void.

On September 14, 1965 Comptroller noticed a motion to dismiss the complaint under Rule 12(b), F.R.Civ.P., or in the alternative for summary judgment under Rule 56(b). In support of this motion defendant urged that the complaint failed to state a claim upon which relief could be granted; that the complaint failed to allege the existence of a justiciable controversy, and that plaintiff (Sussex Bank) lacks standing to maintain the action against the Comptroller.

On October 28, 1965 Peoples Bank moved for an order permitting it to intervene as a defendant and to file a motion to dismiss the complaint for failure to state a claim, or, in the alternative, to file an answer thereto. Leave to intervene for that purpose was granted by this Court's order filed November 24, 1965.

On November 22, 1965 Sussex Bank moved for summary judgment under Rule 56(a) upon the ground that it was entitled to judgment as a matter of law. On motion filed December 20, 1965, Commissioner was permitted to intervene as a plaintiff in this action and to file a motion for summary judgment. A Complaint was filed in behalf of plaintiff-intervenor Commissioner on January 10, 1966.

This case was originally assigned to the Honorable Robert Shaw, one of the Judges of this Court, who, on December 27, 1965, heard partial argument upon the then pending motions and cross motions. At its conclusion the hearing was continued without decision to January 24, 1966. During the period of that continuance the case was re-assigned to the writer of this opinion, who heard further argument upon the pending motions therein and at the conclusion thereof reserved decision. This memorandum embodies that decision.

## JURISDICTION

██ This court has jurisdiction over the cause of action alleged in the complaint of Sussex Bank under 28 U.S.C. § 1331(a) because that cause of action is predicated upon the Federal Statute, 12 U.S.C. § 36(c). Plaintiff Sussex Bank has standing to maintain this action. First National Bank of Smithfield, etc. v. Saxon, Comptroller, et al., 4 Cir. 1965, 352 F.2d 267; State of South Dakota v. National Bank of South Dakota, D.S.D., 1963, 219 F.Supp. 842, affirmed 8 Cir. 1964, 335 F.2d 444, cert. den. 1964, 379 U.S. 970, 85 S.Ct. 667, 13 L.Ed.2d 562; Whitney National Bank v. Bank of New Orleans & Trust Co., 1963, 116 U.S.App. D.C. 285, 323 F.2d 290, rev. on other grounds 379 U.S. 411, 85 S.Ct. 551, 13 L.Ed.2d 386; Suburban Trust Co. v. National Bank of Westfield, D.N.J., 1962, 211 F.Supp. 694; Commercial State Bank of Roseville v. Gidney, D.D.C. 1959, 174 F.Supp. 770, affirmed per curiam on opinion below, Gidney v. Commercial State Bank of Roseville, 1960, 108 U.S. App.D.C. 37, 278 F.2d 871.

## CROSS MOTIONS OF COMPTROLLER AND SUSSEX BANK FOR SUMMARY JUDGMENT

In support of his motion to dismiss, or alternatively for summary judgment, defendant Comptroller submits the affidavit of Richard J. Blanchard, Deputy Comptroller of the Currency for Branches and Mergers from which it appears that pursuant to the authority granted by 12 U.S.C. § 36(c), the Comptroller has established a procedure relating to branch bank applications in accordance with 12 C.F.R. 4.5(d).[1] The factors which according to this procedure are

---

1. 4.5 Establishment of branch banks and seasonal agencies.

    (d) Certification. If the determination of the Comptroller of the Currency is favorable, he issues a certificate to evidence his approval for the establishment and operation of the branch or seasonal agency at the designated location.

to be considered by the Comptroller in determining whether to approve a new branch, for a national bank include the financial history and condition of the bank, the adequacy of its capital structure, its future earnings prospects, the general character of its management, the convenience and needs of the community served by the bank and the proposed branch, whether the bank's corporate powers are consistent with the purposes of the Federal Banking Laws, the probable effect of the proposed branch on competition, including the welfare of other banks, and the tendency, if any, toward monopoly, as well as the limitation contained in 12 U.S.C. § 36(c).

With respect to Peoples Bank, affiant further states: That that Bank's application, dated October 6, 1964, to establish a branch at the M & M Shopping Center in Wantage Township, Sussex County, New Jersey, was received by the Regional Comptroller of the Currency for the Second National Bank Region, Charles M. Van Horn, on October 7, 1964, who, on the same date, advised the New Jersey Commissioner by letter of the receipt of the application; that on October 13, 1964 the New Jersey Deputy Banking Commissioner, Raymond H. Wesner, acknowledged Van Horn's letter of October 7, and informed him that the New Jersey Department of Banking and Insurance had received an application from the Sussex Bank on October 15, 1963 for permission to establish a branch in Wantage Township. Wesner's letter stated that, as of October 13, 1964, the permission sought had not been granted to Sussex Bank, but was being withheld pending an increase in that bank's capital as required by the New Jersey Department as a condition for approval. A field investigation was made by a National Bank Examiner on October 9 and 10, 1964 in connection with the Peoples Bank application for the use of the Comptroller in determining whether to approve or disapprove the application. On October 19, 1964 the Regional Comptroller received a letter from Sussex Bank, dated October 16, 1964, protesting against the pending application of Peoples Bank.

The Blanchard affidavit also states that at no time prior to the Comptroller's approval of the branch application of Peoples Bank did the Sussex Bank request a hearing before the Comptroller pursuant to the provisions of the Administrative Procedure Act, 5 U.S.C. § 1001 et seq. The affidavit concludes that "upon consideration of material submitted by the applicant [Peoples] bank in support of its application, the several recommendations of subordinate personnel of the Comptroller of the Currency, * * * and other materials received in connection with the subject application, including the letters from the Bank of Sussex County and the New Jersey Department of Banking and Insurance, and in accordance with the Comptroller's regular administrative procedures, the then Acting Comptroller of the Currency, Mr. Thomas G. DeShazo, applying the criteria referred to [above], on October 26, 1964 approved the application of the Peoples National Bank of Sparta for a branch in Wantage Township." It further appears that Blanchard notified Peoples Bank on October 26, 1964 that a certificate of approval for the proposed branch had been issued. With respect to an aspect of this case to be hereinafter referred to, the affidavit also states that, as of September 9, 1964, and during the tenure in office of the present Comptroller "there never has been any agreement, working or otherwise, between the Comptroller and the New Jersey Department of Banking and Insurance whereby approval of competing state and national branch bank applications would be given on the basis of priority in filing."

Comptroller contends that:

1. The approval of the application of Peoples Bank and the establishment of its branch in Wantage Township occurred prior to the establishment of any other bank or branch in said Township.

2. When acting upon applications for establishment of branches of national banks, Comptroller is not required to hold adversary hearings under the Administrative Procedure Act, and, in any event, Sussex Bank may not so contend because it failed to request a hearing after it had knowledge of the pendency of the application of Peoples Bank before the Comptroller.

3. On none of the relevant dates herein referred to was there any agreement in existence between the present Comptroller and the Commissioner for the establishment of a priority for the branching of national or state banks on the basis of the filing of an application.

4. The only agreement between the respective federal and state banking regulatory officials "was for the reciprocal exchange of information of mutual interest between the respective officers relating to applications for the organization of new banks, establishment of branches, relocation of offices, change in title, etc." [and] "the New Jersey Bank Officials by their own statement recognized and acknowledged that no priority agreement, such as is alleged by plaintiff, exists with the present Comptroller of the Currency."

In his affidavit supporting the bank's complaint in this action, William L. Hill, [President of Sussex Bank] alleges that, after he had learned that the Comptroller had approved the Peoples Bank application, he, as President of Sussex Bank, had forwarded a protest to the New Jersey Commissioner, and further, that after Peoples Bank had commenced its branch operation in Wantage Township, he had received a telephone call from the Comptroller in which the Comptroller apologized to Hill and to Sussex Bank for the action of the Comptroller's office in having granted authority to Peoples Bank to open the branch in Wantage Township. Hill also states in his affidavit that, in the same telephone conversation, the Comptroller said that while he was attending a convention in Florida his office had "made a serious mistake in approving the application of the Peoples National Bank of Sparta to open a branch in Wantage Township and that the approval to open such a branch had been made in 'error' by one of his subordinates, without his knowledge or approval. Mr. Saxon also stated he did not know what he could do about this matter and said he would make every effort to 'straighten the matter out' and that he would again telephone Charles R. Howell, Commissioner of the Department of Banking and Insurance of New Jersey, to see what could be done. I asked Mr. Saxon to take immediate steps to rescind the approval granted to the Peoples National Bank of Sparta and to have the trailer from which they were operating removed from Wantage Township. I then told Mr. Saxon that my bank had been placed in a very embarrassing position as its application had been on file with the New Jersey Commissioner's office for many months, to which Mr. Saxon replied that he knew that was so, and that he would endeavor to straighten this matter out. I then told Mr. Saxon that it was my opinion that this matter should be straightened out within the next few days, and Mr. Saxon replied that he would further contact Mr. Charles R. Howell to explore the matter and see what could be worked out."

There is also annexed to the complaint in this case an affidavit by Commissioner Howell which discloses that when he was informed that Peoples Bank had opened its branch on October 27, 1964, his office protested that action to Regional Comptroller Van Horn and to appropriate officials in the Comptroller's office in Washington, "the Comptroller himself being out of town." The same affidavit states that Comptroller telephoned Commissioner at 2:30 p. m. on October 30, 1964 and stated that the Comptroller's office, "had made a mistake in approv-

ing the application of Peoples National Bank, that he regretted the action, and that he would not have approved the application had he had all the facts before him. He indicated that he would look into the matter further. He agreed to call William L. Hill, President of the Bank of Sussex County and inform him of the mistake." It also appears that the Commissioner or persons in his office unsuccessfully endeavored on several dates, commencing with November 4, 1964 and terminating March 22, 1965 to ascertain from Comptroller what, if any action he proposed to take respecting the subject which had been discussed by the two officials by telephone. Finally, on April 5, 1965 Comptroller advised Commissioner as follows: "On the matter of the Bank of Sussex, I am frank to tell you I just don't know what to do in this matter, or how, indeed, anything can be done. As I mentioned before to you, I exceedingly regret that this thing came about, but the undoing of it is much more difficult than the doing." Mr. Howell adds that at a conference on April 22, 1965 in West Virginia he met Comptroller who reiterated the substance of his letter of April 5. In his affidavit of January 17, 1966 submitted in opposition to plaintiff's cross motions for summary judgment and in support of Comptroller's motion to dismiss the complaint or in the alternative for summary judgment, Comptroller admits that he had a telephone conversation with Commissioner Howell on October 30, 1964 regarding the approval of a branch of Peoples Bank, but states that he was unable to recall the exact words used in the conversation though that its purpose was "to express regret at any difficulties and misunderstanding that the branch approval may have created since the [Comptroller] desired to maintain a harmonious relationship between his office and Commissioner Howell's office." Comptroller also admitted that he telephoned Mr. Hill on the same date, October 30, 1964, but was unable to recall the exact wording of his conversation with him. It further appears that Comp-troller caused his office to review the Peoples Bank matter and that a meeting was held on November 20, 1964 attended by two of his deputies, by the New Jersey Commissioner, Mr. Hill and others for a discussion of their respective views. He was informed of the results of the meeting and ultimately determined that his approval of the branch of Peoples Bank was correct and proper in all respects. Comptroller's affidavit admits that he wrote a personal letter to the Commissioner on April 5, 1965 which contained the statement quoted in his affidavit that "during his tenure in office as Comptroller of the Currency he has never authorized or entered into any agreement with any state banking regulatory agencies whereby approval of competing national and state banks would be given on the basis of priority of filing time."

Sussex Bank contends, in support of its motion for summary judgment, that the Comptroller's action in approving the application of Peoples Bank for a branch in Wantage Township was arbitrary, capricious and an abuse of discretion in that Comptroller violated the written priority agreement entered into by the Comptroller implementing the National Bank Act of 1933, and that the Comptroller's action was so lacking in procedural and substantive fairness as to fall within the prohibition of Section 10 of the Administrative Procedure Act, 5 U. S.C. § 1009.

Sussex Bank construes the content of an exchange of correspondence between the Comptroller's office and that of the New Jersey Commissioner as an agreement to implement the operation of the dual banking system (national and state) as contemplated by Congress. The first item in that correspondence was a letter, written in 1959 by the then incumbent (Gidney) of the office of the Comptroller of the Currency to the then and present incumbent (Howell) of the office of New Jersey Commissioner of Banking and Insurance. The letter referred to "a working agreement between our agencies for the processing of branch

applications." By way of memorializing such an agreement in a single document the letter stated as follows: "The date of the letter of notification, or a filing date if indicated [shall] be considered by the other agency as the date for the creation of a preference. If it is deemed advisable that preference be disregarded, the supervisory agency desiring to take such step [shall] advise the other agency as promptly as possible of its proposed action with reasons for that action." To the foregoing letter from the Comptroller the New Jersey Commissioner responded in part as follows: "The agreement as to the processing of branch applications as outlined in your letter of August 24, 1959 is acceptable to me. I am pleased that our agencies have now arrived at an understanding."

In support of its contention that the foregoing correspondence constituted a binding working agreement between the two regulatory offices within the intendment of the Congress, Sussex Bank relies upon National Bank of Detroit v. Wayne Oakland Bank, 6 Cir. 1958, 252 F.2d 537, cert. den. 358 U.S. 830, 79 S.Ct. 50, 3 L. Ed.2d 69. We do not construe that case as so holding. The facts involved therein may be summarized as follows: A State bank filed application with its State Commissioner for approval of a branch in the City of Troy. Pursuant to approval obtained, the bank established a branch at the desired location, and at the time of its establishment no other bank had been established in the City. Between the date of its application and that upon which the State bank opened its branch, a National bank applied to the Comptroller for permission to establish a branch in the same City, and, before the Commissioner's approval of the application of the State bank, the Comptroller notified the National Bank that its application had been approved and advised the State Commissioner of the fact of such approval. The State bank sought a declaratory judgment that it would be unlawful for the National bank to open a branch bank in Troy after the State bank had established its branch in that City. The District Court was affirmed in holding that it would be unlawful for the National bank to open under such circumstances because of a statute of the State of Michigan which prohibited establishment of a branch of a bank in a City in which a State or National bank, or branch thereof, was then in operation. The Court further held that 12 U.S.C. § 36, which authorizes a National bank to establish a branch if a State bank branch is at the time authorized by statute law of the State, did not permit the establishment of a National bank, even with the approval of the Comptroller, at a location where a branch of a State bank had been established. The trial court had found that the State bank "had already opened, and had in operation, a branch in Troy," and therefore "the subsequent establishment in the same city of a branch of another bank, such as the National Bank of Detroit, which was chartered to do business in another city, was prohibited by Title 12 U.S.C.A." This holding, alone, is not helpful to Sussex Bank. However, the opinion on appeal in the cited case discloses that there was "a working arrangement between the Comptroller of the Currency and the Michigan State Banking Commissioner, to the effect that the Comptroller would always notify the State Banking Commissioner of any application by a National bank for the opening of a branch, in the State of Michigan. Obviously, this was to avoid the Comptroller's approval of a branch of a national bank in a city in Michigan *in which a State bank or its branch was already established, or had been approved by the Michigan State Banking Commissioner*." (Emphasis supplied). Thus the Court, by noting that there had been a deviation from the established practice under the working arrangement does, by dicta, support the plaintiff.

The Regulations of the Comptroller, 12 C.F.R., Sec. 4.5(a) (3), promulgated under 12 U.S.C. Sec. 1, provide that, if his decision upon a branch bank application is unfavorable, the applicant is so notified; but if his decision is favorable, the

140

Comptroller issues a formal certificate evidencing his approval and consent to the establishment and operation of a branch bank at the designated location. The opinion in the Michigan case discloses that no certificate of the Comptroller was issued prior to the opening of the State bank branch in Troy, and, indeed, the Comptroller had informed the National bank that its branch should not open until the certificate was issued. In the case at bar the Comptroller's certificate was issued the day preceding, and received the day of, the commencement by Peoples Bank of its branch operation. The Court in National Bank of Detroit, supra, expressed its recognition of "the wisdom of cooperation between the state and federal banking authorities in matters affecting the approval, and the establishment, of state and national banks", and stated that the Congress and the Michigan Legislature intended that such cooperation should exist, that "[t]he express provisions of the federal statute governing the establishment * * * of national banks look to what has been done by the state; and the express provisions of the state statute look to what has been done by the federal government."

The uncontradicted evidence before me upon the pending cross motions discloses a glaring and ridiculous lack of cooperation between the United States Comptroller of the Currency and the New Jersey Commissioner of Banking and Insurance with respect to the establishing of a branch bank in Wantage Township, New Jersey. Such a lack of cooperation between the regulatory agencies charged with the responsibility of maintaining the dual banking system contemplated by the Congress cries aloud for judicial intervention.

■ Sussex Bank and the New Jersey Commissioner charged that the conduct of the Comptroller which is disclosed by the evidence was arbitrary and capricious and constituted an abuse of his administrative authority. Plaintiff, Sussex Bank, has standing to seek a judicial review of Comptroller's action. Whitney National Bank, etc. v. Bank of New Orleans & Trust Co., 1963, 116 U.S.App.D. C. 285, 323 F.2d 290, rev. on other grounds, 1965, 379 U.S. 411, 85 S.Ct. 551, 13 L.Ed.2d 386; National Bank of Detroit v. Wayne Oakland Bank, 6 Cir. 1958, 252 F.2d 537, cert. den., 1958, 358 U.S. 830, 79 S.Ct. 50, 3 L.Ed.2d 69; First National Bank of Smithfield v. First National Bank of Eastern North Carolina, E.D.N.C.1964, 232 F.Supp. 725, rev. on other grounds, 1965, 352 F.2d 267.

■ The Administrative Procedure Act, 5 U.S.C. § 1001 et seq. is applicable to the Comptroller in proceedings under the National Bank Act relating to the establishment of branch banks. First National Bank of Smithfield, supra; Community National Bank of Pontiac v. Saxon, 6 Cir. 1962, 310 F.2d 224.

At the conclusion of the hearing upon the pending motions before Judge Shaw of this Court, Comptroller was directed by the Court to produce for its inspection, the Comptroller's administrative file relating to the Peoples Bank branch application. That file, less intra-office memoranda, asserted to be privileged, has been reviewed by the writer of this opinion. Its contents failed to disclose any impropriety in the processing of the application through the Comptroller's office. It does, however, reveal remarkable expedition on the part of the office in investigating and approving the application and contains ample documentary evidence of the awareness of Comptroller of the pendency before the New Jersey Commissioner of the application of Sussex Bank for approval of a branch in Wantage Township, and the existence of vigorous protests in behalf of Sussex Bank, and by the New Jersey Commissioner, against the Comptroller's receipt and processing of the branch application of Peoples Bank. The absence of any documentary evidence of Comptroller's concern respecting the pendency of Sussex Bank's application is impressive. The file does contain a copy of a letter from the President of Peoples Bank to the New Jersey Commissioner, dated October 16, 1964, which recognizes the

pendency of the application of Sussex Bank and inquires whether the application still pends and what action has been taken with respect thereto. The letter concludes with the statement that, if the application of Sussex Bank is still pending, Peoples Bank will expect to have an opportunity to be heard respecting its interest in the matter and to receive notice of such hearing. A copy of the letter referred to was transmitted to the Deputy Comptroller of the Currency. A letter from the Regional Comptroller, Van Horn, to the New Jersey Commissioner, dated October 7, 1964, advised the Commissioner of the filing on that date of the branch application by Peoples Bank. The Comptroller's office was fully aware, when the Peoples Bank's application was filed, that the Sussex Bank's application had been on file with the Commissioner for approximately a year, and that steps were being taken to comply with the Commissioner's condition that its stock be increased. For some undisclosed reason the Comptroller's office disregarded the priority of filing of Sussex Bank's application, conducted a speedy investigation with respect to the application of Peoples Bank, held no hearing thereon, despite awareness of protests against same, and granted the application without more.

■■ With respect to the exchange of letters in 1959 by the then Comptroller and Commissioner, the present Comptroller (Saxon) claims that he was not bound by any agreement, oral or otherwise, which might have been entered into by his predecessor with the New Jersey Commissioner. I reject this contention. For whatever it was worth the agreement or understanding evidenced by the 1959 correspondence warranted recognition by the present incumbent of the office of Comptroller as it was acknowledged by his predecessor. While it is true that neither the federal nor the state statute which has been cited contains any provisions according priority to the branch application which is first filed, the Congressional intent implicit in the legislation requires that the two regulatory of-

fices cooperate at least to the extent of avoiding a mad scramble on the part of federal and state banks to secure the advantage of a prior filing in the appropriate office. While the Blanchard affidavit denies that Sussex Bank requested a hearing before the Comptroller prior to the filing of the branch application of Peoples Bank, the Comptroller's administrative file as well as the affidavits submitted upon the pending motions clearly discloses that Sussex Bank desired a hearing before the Comptroller promptly after that bank learned of the application of Peoples Bank and before the Comptroller approved the application. It is equally clear that no hearing was given.

At hearings before the Committee on Banking and Currency of the House of Representatives, First Session, 88th Congress, there was inserted into the record by the Comptroller of the Currency a document entitled "Procedures followed by the office of the Comptroller of the Currency in the investigation and screening of all applications by national banks to establish a branch." Its procedures call upon the examiner or Regional Chief to comment upon the merits of any known opposition to the approval of a branch bank and if written protests exist they are required to be submitted in full with the Examiner's Report. Moreover, before final decision is made all facts in opposition are to be carefully weighed and, if the opponents desire to present their case in person, arrangements are made for such a meeting. In the Comptroller's administrative file is a printed form entitled "Supplemental information developed in relationship to an application filed by Peoples National Bank of Sparta * * * to establish a branch to be located at Route 23, M & M Shopping Center, Wantage Township, Sussex County", filed October 6, 1964. With respect to the proposed branch the form calls for information respecting competitive bank and branches located within the service area of the proposed branch. Under that heading there is inserted the name of Sussex Bank, its existing branch

offices and its proposed Wantage Township branch for which it is stated that an application is pending but not yet approved.

It further appears from the same report that the branch which Peoples Bank was to open would be located on property to be leased in an addition to be constructed to the main supermarket building at the location in question and that the contemplated new construction would be completed within four months after notification of branch approval and that the branch would be in operation within five months after such approval. As a matter of fact the operation of the branch commenced in a trailer on October 27, 1964. While Sussex Bank was in the process of complying with the Commissioner's requirement for his approval of a branch in Wantage Township, Peoples Bank and the office of Comptroller moved rapidly and successfully to preclude Sussex Bank from the enjoyment of the lawful fruits of its efforts to comply with the Commissioner's requirements.

It is clear and uncontradicted that Peoples Bank established its branch with the permission of Comptroller prior to the establishment of any other bank or branch in Wantage Township. The circumstances under which that permission was obtained and granted might present critical factual issues which Sussex Bank may be entitled to have resolved despite Comptroller's present contention that no adversary hearing under the Administrative Procedure Act, 5 U.S.C. § 1001 et seq., with respect to an application by a national bank for permission to establish a branch is required. Comptroller cites and relies upon the decision of this Court in Suburban Trust Company v. National Bank of Westfield, D.N.J.1962, 222 F. Supp. 269. That decision was apparently never appealed, but a recent and authoritative decision supports Comptroller's present contention. First National Bank of Smithfield, etc. v. Saxon, Comp., etc., et al., 4 Cir. 1965, 352 F.2d 267, reversed the decision of the District Court for the Eastern District of North Carolina (1962), 232 F.Supp. 725, in holding that the Comptroller was authorized to approve the establishment of a branch of a national bank without a hearing conforming to the requirements of the Administrative Procedure Act. The Appellate Court in the Smithfield Bank case expressly disclaimed "deciding whether it would be advisable or equitable for the Comptroller to grant a hearing." The sole decision was "that the law does not require it." The opinion in this case continues:

"This is not to say that there may not be judicial review of the Comptroller's action. We hold, too, that the bank's competitor has standing to seek the review, not because of the potential sharpening of competition, but because they have an immediate concern, apart from the public generally, to prevent an approval contrary to law. Thus they are 'interested' within the purpose (sic) of § 1004 (b) APA."

The opinion points out (352 F.2d p. 270) that "[T]he legislative history of the APA discloses that Congress expressly disavowed any intent that the Act demand a hearing except where already required by some other statute." The opinion also recites (p. 270) that "Procedural due process is not offended by the Comptroller's practice [of dispensing with a hearing.] The absence of a hearing provision in the Banking Act raises no Constitutional question, for the omission was within the power of Congress." However the Court recognizes the existence of abundant authority for the holding that the Comptroller's determination "is not immunized from review by the exemption in the preface of § 1009, APA, reading, 'Except so far as * * * agency action is by law committed to agency discretion.' Any discretion vested in the Comptroller in passing upon applications for approval of bank branches is not the type of discretion to which action has been 'committed by law' but is rather one of the character expressly made reviewable by § 1009(e) (1)." For the purpose of the court review which the opinion recognizes as available to a party pro-

testing the action of the Comptroller, it is pointed out on page 271 that "[N]o evidential record need first be developed before the Comptroller. No such prerequisite is exacted by the APA; plainly it envisions instances where the evidence initially is to be taken in a suit reexamining the agency action. To this end the Act gives the court jurisdiction to 'hold unlawful and set aside agency action * * * found to be * * * unwarranted by the facts to the extent that the facts are subject to trial de novo * * *.' § 1009(e) (6). Nothing in the statute precludes the court from discovering the facts for the first time." The Court of Appeals stated (p. 272) that "On the remand of this case, the plaintiff may adduce evidence demonstrating the impermissibility of the Comptroller's approval of a branch bank at Smithfield. Testimony to the contrary will be receivable from the Comptroller. The Court will then find the facts. Thereon, it will judge de novo the validity, in fact and in law, of the Comptroller's final action."

 In the light of the *Smithfield* appellate holding Sussex Bank has a standing to seek in this action a trial de novo of the propriety of the action taken by the Comptroller, for, in the language of *Smithfield* (p. 272), "[A] competitor has an obvious interest sufficient to warrant his insistence that no branch bank be established through procedures or upon grounds not acceptable under the permissive statutes."

The disclosures made by the numerous and voluminous affidavits submitted in support of and in opposition to the pending cross motions disclose factual issues requiring a plenary trial for the purpose of obtaining this court's determination of the ultimate question whether, in the light of all of the facts to be found, the Comptroller's action upon the branch application of Peoples Bank was warranted. Accordingly, each of the motions and cross motions is denied, and the parties are directed to proceed with all diligence to file appropriate pleadings and pursue justified discovery toward the objective of an early trial.

Despite the reversal in *Smithfield,* the District Court was authorized by the Court of Appeals on remand to reinstate its injunction pendente lite if so advised. Whitney National Bank v. New Orleans Bank & Trust Co., 1965, 379 U.S. 411, 85 S.Ct. 551, 13 L.Ed.2d 386. No application has been made to me by any of the parties for preliminary injunctive relief. Leave is hereby now granted to move for such relief with all reasonable diligence.

The cross motions to dismiss and for summary judgment are denied. Any appropriate answering pleading shall be filed and served within 20 days next succeeding the filing of the order implementing this opinion.

Submit order in accordance with the views herein expressed.