Albert E. LEUTHOLD, Superintendent of Banks, State of Montana, Helena, Montana, Security Bank and Miners Bank of Montana, N. A., Plaintiffs,

v.

William B. CAMP, Comptroller of the Currency, Defendant.

The First National Bank of Butte and Daly National Bank of Anaconda, Intervenors.

No. 1444.

United States District Court
D. Montana,
Butte Division.

Aug. 29, 1967.

696

Forrest H. Anderson, Atty. Gen. of Montana, Donald A. Garrity, Asst. Atty. Gen. of Montana, Helena, Mont., for plaintiff Leuthold.

John M. Schiltz, of Hutton, Schiltz & Sheehy, Billings, Mont., for plaintiff Security Bank.

Fred J. Weber, of Weber, Bosch & Kuhr, Havre, Mont., for plaintiff Miners Bank of Montana N. A.

Moody Brickett, U. S. Atty. for D. of Montana, Butte, Mont., Michael R. Lemov, Dept. of Justice, Washington, D. C., for defendant Camp.

Howard A. Johnson and Keith P. Johnson, Butte, Mont., for intervenor First National Bank of Butte.

John L. McKeon, of McKeon & Brolin, Anaconda, Mont., John D. French, of Faegre & Benson, Minneapolis, Minn., for intervenor Daly National Bank of Anaconda.

## OPINION AND ORDER

RUSSELL E. SMITH, District Judge.

This case concerns branch banking in Montana. The Bank Holding Company Act, 12 U.S.C. § 1841 et seq. and The National Bank Act, 12 U.S.C. § 36(c) are involved.

The plaintiffs are: Albert Leuthold, Superintendent of Banks of the State of Montana (Superintendent), who has general supervisory power over state banks, and who is charged with the duty of executing all laws in relation to banks [1] and who may close any bank which has violated any law of the state [2] Security Bank (Security), a bank chartered under the state law with offices in Butte; the Miners Bank of Montana, N. A. (Miners), a bank chartered under the federal law with offices in Butte.

The defendant is William B. Camp, Acting Comptroller of the Currency of the United States (the Comptroller).

The intervenors are The First National Bank of Butte (First of Butte) and Daly National Bank of Anaconda (Daly). Both are federal banks. Daly is a subsidiary of, and is controlled by, Northwest Bancorporation, a bank holding company. Daly proposes to acquire the assets of the First of Butte in exchange for stock of Northwest Bancorporation; to consolidate the First of Butte and Daly, and then to maintain full banking facilities in the present offices of the First of Butte and Daly. The Comptroller has approved the plan and will issue a final certificate of approval unless enjoined by this court. At the outset the court is faced with motions upon which rulings have been reserved and with affirmative defenses questioning the standing of the plaintiffs to sue and the court's jurisdiction.

## JURISDICTION AND STANDING TO SUE.

This court does have jurisdiction and all parties have standing to sue. The decisions of the Comptroller relating to branch banking are subject to review under the provisions of the Administrative Procedure Act.[3] The problem is fully discussed in First National Bank of Smithfield, N. C. v. First National Bank of Eastern North Carolina (Saxon, Comptroller of the Currency) 232 F.Supp. 725 (E.D.N.C.1964), affirmed on this point, 352 F.2d 267 (4 Cir. 1965); Community National Bank of Pontiac v. Saxon, 310 F.2d 224 (6 Cir. 1962); Bank of Dearborn v. Saxon, 244 F.Supp. 394 (E. D.Mich.1965); American Bank and Trust v. Saxon, 248 F.Supp. 324 (W.D.Mich. 1965); Continental Bank v. National City Bank, 245 F.Supp. 684 (N.D.Ohio 1965), rev'd on other grounds, 373 F.2d 283 (1967); Bank of Sussex County v. Saxon, 251 F.Supp. 132 (D.N.J.1966). While the cases do not specifically say so, it is clear from the alignment of the parties that the courts treated competing banks as "person[s] suffering legal wrong * * * or adversely affected or aggrieved" within the meaning of 5 U.S.C.

1. R.C.M.1947, § 5–602, as amended.

2. R.C.M.1947, § 5–1101.

3. 5 U.S.C. § 1001 et seq.

§ 1009(a), and therefore entitled to a judicial review of agency action.

Whitney National Bank in Jefferson Parish v. Bank of New Orleans, 379 U.S. 411, 85 S.Ct. 551, 13 L.Ed.2d 386 (1965) is not contrary. For the reasons later set forth the Bank Holding Company Act is not applicable here. In Whitney National Bank the issues which arose out of the Bank Holding Company Act were cognizable solely by the Federal Reserve Board and its findings were binding upon the Comptroller. The Bank Holding Act provides that the decisions of the Federal Reserve Board are reviewable in the Circuit Courts.[4] The court in Whitney simply held that method of review to be exclusive.

■ The Superintendent's standing to sue is not so clear. On this issue defendants and intervenors rely upon State of South Dakota v. National Bank of South Dakota, 219 F.Supp. 842 (D.S.D. 1963), affirmed 335 F.2d 444 (8 Cir. 1964), cert. den. 379 U.S. 970, 85 S.Ct. 667, 13 L.Ed.2d 562 (1965).[5] Plaintiffs rely upon Jackson v. First National Bank of Valdosta, 349 F.2d 71 (5 Cir. 1965). Neither of these cases consider the applicability of the Administrative Procedure Act. In the South Dakota case substantial reliance was placed upon the proposition that where a regulatory act provides criminal penalties and is silent as to civil enforcement, that the criminal remedy will be deemed exclusive.[6] It is not desirable to use the criminal courts for a determination of economic rights. The penalties for incorrectly interpreting a law are too great and the criminal courts, because of the jury's inalienable right of pardon and the fact that the prosecutor cannot appeal from judgments of acquittal, are poor forums for the resolution of legal problems. The Administrative Procedure Act embracing as it does the declaratory judgment concept and providing rights of review which are not dependent upon a specific congressional authority to be found in the basic regulatory law, expresses a philosophy at odds with that underlying the rules relied upon in the South Dakota case. Even if the right of review in this case could not be found in the language of the Administrative Procedure Act, the court would consider it in appraising the South Dakota result.

■ The Jackson case is followed here insofar as the "standing to sue" problem is treated as one concerned with the interest of the Superintendent in the subject matter of the litigation, and the sufficiency of that interest to qualify him as a party plaintiff.[7] This court considers jurisdiction to be a different problem. Many have standing to sue who may not find their way into the federal district courts,[8] and the court here does not hold that Congress, in § 36(c) of the National Bank Act, adopted the remedial provisions of state law, and thus obliquely conferred jurisdiction on this court. In other words, the holding here is that the Superintendent is a person "suffering legal wrong * * * or adversely affected or aggrieved" within § 1009(a) of the Administrative Procedure Act:

4. 12 U.S.C. § 1848.

5. It may be noted that the Circuit Court did not pass upon the Superintendent's standing to sue for violation of the National Banking Act.

6. The eighth circuit seems to answer the question of standing in terms of the existence of a remedy.

7. "Moreover, the Superintendent, as the primary enforcement officer of state banking laws which, under § 36(c), govern national banking associations, is particularly qualified to act as a plaintiff in cases such as this. He is also particularly well situated to represent interests adverse to those of a national bank which, even with the approval of the Comptroller of the Currency, would naturally be inclined to push the restrictions of § 36(c) to, or, if possible, beyond, their proper limits." Jackson v. First National Bank of Valdosta, supra, at 75.

8. The case of First National Bank of Bay City v. Fellows, on Relation of Union Trust Company, 244 U.S. 416, 37 S.Ct. 734, 61 L.Ed. 1233 (1917) cited in Jackson did not involve the problem of jurisdiction of the federal district court.

■ In separate findings the court has concluded that as to Miners the value of the matter in controversy is in excess of $10,000.00. The solution of the controversy depends upon the application of the National Bank Act and the Bank Holding Company Act. A federal question is involved and at least as to Miners the court does have jurisdiction under § 28 U. S.C. 1331(a).[9]

## THE NATIONAL BANK ACT

The Butte and Anaconda offices of the consolidated bank may be retained and operated unless such operation offends § 36(c) of the National Bank Act which provides in part:

"A national banking association may, with the approval of the Comptroller of the Currency, establish and operate new branches: * * * (2) at any point within the State in which said association is situated, *if such establishment and operation are at the time authorized to State banks by the statute law of the State in question by language specifically granting such authority affirmatively and not merely by implication or recognition,* and subject to the restrictions as to location imposed by the law of the State on State banks." (Italics supplied)

The problem in this case arises under the italized portion of the section.

In 1927 the Montana Legislature adopted what now appears as § 5–1028 R.C.M. 1947. It provides:

"No bank shall maintain any branch bank, receive deposits or pay checks, except over the counter of and in its own banking house. Provided, that nothing in this section shall prohibit ordinary clearing house transactions between banks * * * " [10]

In 1931 the Montana Legislature adopted what now appears as § 5–1124 R.C.M. 1947. It provides:

"When any two or more banks located in the same county or in adjoining counties shall consolidate in accordance with the provisions of section 5–1021, the consolidated bank may, if it has a paid up capital of seventy-five thousand dollars ($75,000.00) or more, upon the written consent of the superintendent of banks and under rules. and regulations promulgated by him, *maintain* and operate offices in the locations of the consolidating banks." (Italics supplied)

The Daly and First of Butte are located in adjoining counties. They have a paid up capital in excess of Seventy-five Thousand Dollars ($75,000.00). The consolidation will not be under § 5–1021 R.C.M.1947, the state law providing for consolidation, but under federal authority. None of the parties contend that this poses any problem.

The superintendent has not given his consent and has promulgated no rules governing the operation of consolidated banks. Under § 5–1124, and under these facts, may the consolidated bank maintain two separate banking facilities?

■ It is not seriously urged that the lack of consent by the Superintendent is fatal to the proposed operation. It seems clear that it is not.[11]

■■ The real controversy on the National Bank Act aspect of this case revolves about the plaintiffs' argument that § 5–1028 forbids branch banking in Montana, and that § 5–1124 provides no exception even in those cases falling within its provisions. The plaintiffs argue that the word "branch" has a very special meaning; that the word "office" is a word with broad connotations; and that the use of the word "office" in § 5–1124

9. Suburban Trust Company v. National Bank of Westerfield, 211 F.Supp. 694 (D.N.J.1962) ; Bank of Sussex County v. Saxon supra.

10. This section was amended in 1963 to permits detached drive-in and walk-up facilities under some circumstances. R.C.M. 1947, § 5–1028 (Supp.1967).

11. First National Bank of Smithfield, North Carolina v. Saxon, supra; American Bank and Trust Company v. Saxon, supra.

cannot be held to embrace the word "branch" as used in § 5–1028. It is further argued that had the legislature intended to amend § 5–1028, it would have done so by amending that section, rather than enacting § 5–1124, which makes no reference to the branch banking statute. The plaintiffs bolster their arguments by statements of the Superintendent of Banks who has administratively interpreted the act, and by the opinion issued by the Attorney General of the State of Montana.[12] It is the opinion of the court that § 5–1124 created an exception to § 5–1028, and does in the limited classes of cases therein described permit branch banking in Montana.

■ The main problem is to find the intention of the legislature. The first place to look for that intention is in the words used. What did a Montana legislator reading the word "office" in the bill which became § 5–1124 contemplate? Did he envisage a space in which tellers stood behind counters, received deposits and cashed checks, and officers sat at their desks, frowned and made loans? It is probable that he did, because in Montana, at least, there is no other image of a bank office. If he did, then he envisaged branch banking, because basically the business of banking is receiving deposits and making loans. The word "office" is not foreign to banks and is commonly used to describe the place where banking activities take place. Congress has used the word in that sense.[13] The Federal Reserve Board uses the word in that sense.[14] The courts use the word in that sense,[15] and even the plaintiffs in their complaint use the word "office" to de-scribe the place where the banking activities of the party banks take place. The Montana legislature, in the sections of the Commercial Code dealing with banking, uses the words "office" and "branch" as equivalents.[16] In the absence of a compelling reason for believing that the word "office" was used in some limited sense, it must be given its ordinary meaning, and in its ordinary meaning the word "office" describes a place where banking business is done.

This conclusion is fortified by the fact that unless the word "office", as used in § 5–1124 is given its normal meaning, the section does nothing. The Superintendent suggested in a memorandum to the Montana legislature that § 5–1124 was enacted to "permit banks that were forced into liquidation to consolidate with another bank and to maintain an office for two or three months to wind up their banking business."[17] Apart from the fact that the language of the section indicates no such purpose and that there is no legislative history indicating it, the terms of the act seem to forbid any such interpretation. The use of the word "maintain" suggests continuity and casts doubt upon the suggestion of an operation limited to a period of two or three months. Why, if it were simply a matter of permitting activities necessary to close a consolidated bank, did the legislature confine the operation of this section to banks in adjoining counties, when, under § 5–1021, banks may be consolidated without regard to the county in which they are located? Why did the legislature require minimum capitalization if the office were to be operated for some

12. There is no need here to elaborate on the proposition that the National Bank Act sought to achieve an equality between state and national banks in branching matters: (First National Bank of Logan v. Walker Bank, 385 U.S. 252, 87 S.Ct. 492, 17 L.Ed.2d 343, 1966) and that what is forbidden to state banks by statute is also forbidden to national banks.

13. 12 U.S.C. § 36(b) (2).

14. Statement of Governor Robertson on behalf of the Federal Reserve Board be-fore the House Committee on Banking & Currency, 82d Cong., 2d Sess., (June 24, 1952) pp. 16–18.

15. First Hardin National Bank v. Fort Knox National Bank, 361 F.2d 276 (6 Cir. 1966), cert. den. 385 U.S. 959, 87 S.Ct. 394, 17 L.Ed.2d 304 (1966).

16. R.C.M.1947, §§ 87A–4–102 and 87A–4–106.

17. This same thought is expressed in an opinion of the Attorney General of Montana and in the briefs of the plaintiffs.

limited purpose or time? Why would the consent of the Superintendent, who has general supervisory powers be required for the maintenance of a temporary office for such limited purposes? Aside from all else, however, the question to which no one has given a satisfactory answer remains: Why, if § 5–1124 was intended to permit some activity short of banking, was it enacted at all? There is not now, and was not in 1931, any law which forbad banks from maintaining offices wherever they chose so long as they did not conduct a banking business in them.

■ Because § 5–1124 means nothing if the word "office" is given something less than its normal meaning, and because no reason has been suggested which indicates to the court that the legislature did intend a limited meaning, the court holds that § 5–1124 creates an exception to § 5–1028, and that what is sought to be done by the consolidating banks does not offend the statutory law of Montana. A consideration of the position of the superintendent and the opinion of the Attorney General of Montana and the other canons of construction urged by plaintiffs does not lead to a contrary conclusion.

When the Montana legislature in § 5–1124 used the word "office" without limitation, it specifically granted the authority to engage in banking in two locations under the limitations imposed by the section. The mere fact that the parties and counsel argue to the contrary does not mean that the power to maintain two offices arises by implication or recognition.

■ It is argued that the Attorney General has ruled that State Banks may not branch under the conditions described in § 5–1124; that the Superintendent is bound by such ruling; and that henceforth state banks in Montana will be deprived of the equality of treatment which the National Bank Act sought to achieve. The answer to this is that Congress, in Section 36(c) of the National Banking Act, refers to the "stat-

ute law of the state". If the administrator of the state law sees fit to deprive the state banks of rights which the statute law gives them, the resulting inequality is created by administrative fiat and not by statute law.

## THE BANK HOLDING COMPANY ACT.

Section 1842(a) of the Bank Holding Company Act [18] provides in part:

"It shall be unlawful, except with the prior approval of the Board, * * * (4) for any bank holding company or subsidiary thereof, other than a bank, to acquire all or substantially all of the assets of a bank; * * *."

Section 1842(d) provides:

"Notwithstanding any other provision of this section, no application shall be approved under this section which will permit any bank holding company or any subsidiary thereof to acquire, directly or indirectly, any voting shares of, interest in, or all or substantially all of the assets of any additional bank located outside of the State in which the operations of such bank holding company's banking subsidiaries were principally conducted on July 1, 1966, or the date on which such company became a bank holding company, whichever is later, unless the acquisition of such shares or assets of a State bank by an out-of-State bank holding company is specifically authorized by the statute laws of the State in which such bank is located, by language to that effect and not merely by implication. For the purposes of this section, the State in which the operations of a bank holding company's subsidiaries are principally conducted is that State in which total deposits of all such banking subsidiaries are largest. As amended July 1, 1966, Pub.L. 89–485, § 7, 80 Stat. 237."

There is no Montana law authorizing an out-of-State bank holding company to acquire the assets of banks located in Montana.

---

18. 12 U.S.C. § 1841 et seq.

Do the words "other than a bank" appearing in § 1842(a) make the Bank Holding Company Act inapplicable to this case, or do the words in § 1842(d) "notwithstanding any other provision of this section, no application shall be approved" effectively negate the exception provided in § 1842(a)?

It is clear from the language of § 1842(a) that a bank, even if a subsidiary of a holding company, may, without prior Federal Reserve Board approval, acquire the assets of another bank. § 1842(d) does no more than limit the approval power of the Federal Reserve Board. It would seem, therefore, and the court so decides, that § 1842(d) does not apply to asset acquisitions which do not require prior Reserve Board approval. This is the result reached by the District and the Circuit Courts in State of South Dakota v. National Bank of South Dakota, supra.[19]

The court is asked to pierce the corporate veil and hold that since Northwest Bancorporation, by virtue of its ownership of Daly, will own the First of Butte, the Bank Holding Company Act is violated.

There is no suggestion of fraud or deception. Rather the plaintiffs argue that because what is done in terms of real ownership is so like what is prohibited, that what is done likewise should be prohibited. Were the Act which applies here one passed in recognition of some community moral judgment, then a court might be tempted to, and might well look behind the corporate forms, to protect the basic social mos involved. Here, however, we deal with a regulatory measure designed to control the expansion of bank holding companies. There is no declaration that expansion is per se bad—only that each expansion must be evaluated in terms of its effect on the general public interest. The Act itself makes formal and perhaps arbitrary distinctions between asset and stock acquisitions, between bank and bank holding

company acquisitions. Under these conditions it is the court's opinion that it should not, by disregarding the corporate forms, abolish the distinctions that Congress created. This result was reached in State of South Dakota v. South Dakota National Bank, supra.

This opinion together with the separate findings of fact this day filed constitute the court's findings of fact and conclusions of law.

It is ordered that all pending motions be, and the same are, hereby denied. On the merits it is ordered that plaintiffs be denied all relief.

---

19. If what is said on this problem in those decisions is dictum, then this court is not forced, but only persuaded, and the result is the same.