MID–WEST NATIONAL BANK OF LAKE FOREST, ILLINOIS, a national banking association, Plaintiff,

v.

COMPTROLLER OF the CURRENCY OF the UNITED STATES of America (Administrator of National Banks); the First National Bank of Lake Forest, Illinois, a national banking association; Chicago and Northwestern Railway Co., a railroad corporation; and the City of Lake Forest, Illinois, a municipal corporation, Defendants.

No. 67 C 1423.

United States District Court
N. D. Illinois, E. D.

June 14, 1968.

Roy C. Palmer and Thomas J. Weithers, Henshaw, Culbertson, Moelmann & Hoban, Chicago, Ill., Donald Ridge, Diver, Diver, Ridge & Brydges, Waukegan, Ill., for plaintiff.

Kent Chandler, Jr., and William J. Quinlan, Jr., Wilson & McIlvaine, Chicago, Ill., for First National Bank.

John C. Boylan and James P. Daley, Chicago, Ill., for CN&W Ry.

Thomas H. Compere, Corp. Counsel, and Grosshandler & Compere, Waukegan, Ill., for City of Lake Forest.

Edward V. Hanrahan, U. S. Atty., for the Comptroller.

## CROSS MOTIONS FOR SUMMARY JUDGMENT

MAROVITZ, District Judge.

This action, brought by the Midwest National Bank of Lake Forest, Illinois, challenges an order of the Comptroller of the Currency, dated July 13, 1967, approving the application of the First National Bank of Lake Forest to establish a detached drive-up banking facility in the depot of the Chicago and Northwestern Railway Company, in Lake Forest. Named as defendants are the Comptroller of the Currency (in his capacity as Administrator of National Banks), the First National Bank of Lake Forest, the Chicago & Northwestern Railway Company, and the City of Lake Forest.

The parties have filed cross-motions for summary judgment. They have submitted affidavits, documents, the administrative record before the Comptroller, and voluminous briefs in support of their respective motions.

On February 13, 1967, and pursuant to 12 U.S.C. § 36(c) (1), the First Na-

tional Bank of Lake Forest applied to the Comptroller for permission to establish a detached drive-up banking facility in Lake Forest, on premises to be rented from the Chicago & Northwestern Railway. The stated reasons were to alleviate the heavy traffic conditions at the Bank's main facility in downtown Lake Forest, to provide additional service to existing customers, and to enable the Bank to compete more effectively for commuter business with the large "Loop" banks in Chicago.

The application was assigned to a national bank examiner and notice was sent to the competitor banks in the area, including plaintiff. Plaintiff filed a written protest, noting the Illinois prohibition against branch banking (Chap. 16½, § 106, Ill.Rev.Stat.1967), and argu-

ing that the proposed facility did not comply with Illinois law. A hearing was held at plaintiff's request on May 17, 1967, before the Regional Administrator of National Banks, and subsequently the Comptroller approved the application.

This suit was filed a month later to challenge the order of approval, and to seek an injunction restraining the defendant Bank from locating its facility on the proposed site.

Although branch banking is prohibited in Illinois, there are certain exceptions to the rule. Chap. 16½, § 102, Ill.Rev. Stat., permits a facility adjacent and connected to the main banking facility provided it complies with certain conditions,[1] and that section additionally allows a facility established and maintained in accordance with § 105(15).[2]

1. Section 102 provides in pertinent part: "* * * A place at which deposits are received or checks paid or any of a bank's other business is conducted shall not be deemed to be a branch bank, branch office or additional house, office or agency if such place is adjacent to and connected with the main banking premises, or if it is separated from such main banking premises by not more than an alley; provided always that (i) if such place is separated by an alley from the main banking premises there is a connection between the two by public or private way or by subterranean or overhead passage, and (ii) if such place is in a building not wholly occupied by the bank, such place shall not be within any office or room in which any other business or service of any kind or nature other than the business of such bank is conducted or carried on. * * * *"

2. Section 105(15) provides in pertinent part: (referring to the bank's general corporate powers)

"To establish and maintain a facility for the purpose of doing business with the operators of or passengers in motor vehicles provided such facility complies with the following provisions:

(a) No facility shall be more than 1500 feet from the main banking premises of the maintaining bank.

(b) No facility shall be closer than 600 feet to any then existing main

banking premises of another bank unless * * *

* * * * *

(c) No business shall be done at a facility except receiving deposits, cashing and issuing checks, drafts and money orders, changing money and receiving payments on existing indebtedness.

(d) The facility shall be established and maintained in or on an area of such size and with provisions for ingress and egress reasonably adequate to accommodate servicing of at least one motor vehicle at one time without relying on any public way, street or alley for such purpose, and the area necessary for that purpose shall not be used for any purpose other than the business of the maintaining bank permitted to be done at such facility by the terms hereof; provided, however, that the provisions of this subsection 15 shall not be deemed to prevent the maintaining bank from doing such business at such facility with persons who are not operators of or passengers in motor vehicles.

(e) Not more than one facility shall be established or maintained by a bank at any one time, but a facility may be established and maintained pursuant to this subsection 15 even though similar facilities are maintained at or adjacent to and connected with the main banking premises in such place as not to constitute a 'branch bank', 'branch office' or additional office or agency as defined in Section 2 of this Act. * * *"

Subsection (15), which was adopted at a referendum election and became effective January 1, 1967, provides for a species of detached drive-up facilities. The disputed facility in this case is alleged to comply with the requirements of subsection (15), and the Comptroller's approval, as is necessary, was based upon his belief that the facility was in conformity with Illinois law. 12 U.S.C. § 36(c) (1); First National Bank of Logan v. Walker Bank & T. Co., 385 U.S. 252, 87 S.Ct. 492, 17 L.Ed.2d 343 (1966).

■ There is no question that the plaintiff, as a competitor subject to potential competitive harm from the proposed facility, has standing to pursue this action. 5 U.S.C. § 702 (1967); First National Bank of Smithfield v. Saxon, 352 F.2d 267 (4th Cir. 1965); Leuthold v. Camp, 273 F.Supp. 695, 697 (D.Mont.1967). Jurisdiction is proper under the Administrative Procedure Act, 5 U.S.C. § 1009, and under 28 U.S.C. §§ 1348, 1394.

■ The questions in issue are essentially legal ones, calling for a determination whether the proposed facility complies with the applicable state law. Although the Comptroller contends review of his actions is limited by the "substantial evidence" test, or to correct an abuse of his discretion, the court may review his actions to be certain they comport with Illinois law. 5 U.S.C. § 706(2) (A). Since he may only approve an Illinois facility which is permitted under Illinois law, it follows that any action not complying therewith must be reversed.

■ Determinations of such legal issues do not involve the exercise of discretion, unlike issues within the Comptroller's peculiar expertise in the field of banking. Since legal issues are here in dispute, the Court, in effect, must review them *de novo*, paying due regard to any factual determinations made by the Comptroller in reaching his decision, and the record which was before him.

There are three issues to be resolved. First, plaintiff contends that the distance requirements of subsection (15) are not met. Insofar as pertinent, they provide:

"(a) No facility shall be more than 1500 feet from the main banking premises of the maintaining bank.

(b) No facility shall be closer than 600 feet to any then existing main banking premises of another bank unless * * * [not pertinent here]

* * * * * *

[(d)] The distance referred to in this subsection (15) shall be measured in a straight line from the nearest point of one premises to the nearest point of the other premises, the word 'premises' being deemed to mean the boundaries of the real estate on which the facility or the maintaining bank is located, as the case may be, and the areas contiguous thereto which the bank has the exclusive right as owner or lessee to use or maintain for egress from or ingress to or for parking in connection with the main banking house, or as the case may be the facility permitted hereby."

The architectural plans for the proposed drive-up site show that it is located 518 feet from the parent bank and 655 feet from the premises of plaintiff. Both distances meet the statutory requisites.

The statute clearly provides in the last paragraph of subsection (15) that distance is to be measured in a straight line from the nearest point of one premises to the nearest point of the other premises, "premises" being deemed to include "the areas contiguous thereto which the bank has the exclusive right as owner or lessee to use or maintain for egress from or ingress to * * * the facility * * *."

The proposed plans, as is required by subsection (15) (d), and as we shall show *infra*, provide for the facility to have a drive-up facility with "provisions for ingress and egress reasonably adequate to accommodate servicing of at least one motor vehicle at one time without relying on any public way, street or

alley for such purpose * * *." Specifically, the bank facilities will be located in the northeast corner of the present railway depot or station. The drive-in lane will be separated from the regular depot driveway by some form of elevated lane dividers, and will be adequate to accommodate servicing of at least one motor vehicle. The drive-up lane, which the bank will have the exclusive right to use for ingress and egress, constitutes the area "contiguous" to the facility referred to in the last paragraph of subsection (15). The distances between the various premises, considering that area as part of the premises of the new facility, clearly meet the statutory requirements.

Plaintiff, however, contends that the facility does not satisfy the statutory requirements because the defendant bank would not exclusively control the entire private roadway leading to the proposed facility from Deerpath Road and past it to Westminster Street. This argument is based upon plaintiff's interpretation of "ingress and egress" for which it relies not on the last paragraph of subsection (15) relating to "distance", but upon subsection (d) relating to the "area" of the facility, which provides, in pertinent part:

> "The facility shall be established and maintained in or on an area of such size and with provisions for ingress and egress reasonably adequate to accommodate servicing of at least one motor vehicle at one time *without relying on any public way, street or alley for such purpose,* and the area necessary for that purpose shall not be used for any purpose other than the business of the maintaining bank permitted to be done at such facility by the terms hereof; * * *." (emphasis added)

■ We reject plaintiff's position that defendant bank must exclusively control the aforementioned private roadway, for it is based upon a misinterpretation of subsection (15) (d). Paragraph (d) contains area requirements in-

tended to keep the facility's operations out of the city streets and thus permit customers to be served with a minimum of inconvenience to the general public. To reach its conclusion, plaintiff must ignore the statutory language which reads "without relying on any public way, street or alley for such purpose". Those words modify "ingress and egress", and their inclusion precludes an interpretation of the exclusive control provision which would include the entire driveway leading to the street. Obviously, any area within the exclusive control of the bank cannot at the same time be a public way, and therefore, it is reasonable to suppose the legislative draftsmen had in mind two separate features of the facility, access and area of actual location, each to be governed by its own separate condition—i. e. the area of the facility must be within the bank's exclusive control, and access must not rely upon any public way, street or alley.

If the statute did not contemplate a distinction between the area which may not rely upon any "public way, street or alley", and the area to be exclusively controlled by the bank, there would be no reason whatsoever to include in the statute the language referring to "public way".

■ The purpose of the area requirements in paragraph (d) is clearly to prohibit use of city streets for the bank's business of serving customers in automobiles. But an express prohibition against opening a facility directly out on to a public highway is not at the same time a requirement that the bank have exclusive control of the roadway connecting the public highway to the facility. A means of ingress and egress over a private roadway to the area exclusively controlled by the bank for serving its customers is in complete harmony with the statutory intent.

Thus even if subsection (15) (d) were to be read in for purposes of determining distance, which need not be done, it would afford no comfort to plaintiff's position, for the subsection (d) provi-

sion for the area which must be within defendant's exclusive control, refers only to a provision for "ingress and egress reasonably adequate to accommodate servicing of at least one motor vehicle at any one time without relying on any public way, street or alley for such purpose." But the last paragraph of subsection (15) makes clear that in considering distance, the straight line should be drawn up to the contiguous area "which the bank has the exclusive right as owner or lessee to use or maintain for egress from or ingress to * * * the facility"—namely, the area adequate for servicing at least one motor vehicle. On the administrative record submitted herein, there can be no dispute that the distances between the various premises are within the statutory limits.

The second objection raised by plaintiff is that the proposed facility violates subsection (15) (d), as it requires that public property be relied on to accommodate the servicing of motor vehicles. This theory assumes significance because paragraph (d) requires "provisions for ingress and egress reasonably adequate to accommodate servicing of at least one motor vehicle at one time *without relying on any public way, street or alley* for such purpose * * *" (emphasis added).

The proposed facility, including both the northeast corner of the depot and the contiguous area for servicing of motor vehicles, are located on Lot 156 in the City of Lake Forest. In the proceedings before the Comptroller, plaintiff argued that title to Lot 156 lay in the City by virtue of a tax deed obtained in 1894 by one Timothy Howe, and conveyed to the City of Lake Forest in 1895.

The Railway obtained its interest in Lot 156 by deeds of 1887 and 1907 from Lake Forest University. Since at least 1900, the present depot has stood on Lot 156, and the portion comprising the driveway to the building, leading from Deerpath Road, has been maintained as an approach facility by the Railway, and has been regarded as a private roadway,

part of which lies upon the Railway's right of way. No one has ever contested the Railway's title to that portion of Lot 156 which it occupies, or which the Bank now intends to utilize. Plaintiff's counsel apparently has conceded that any possibility of reverter to the University was extinguished by the Illinois "Reverter Act", Ch. 30, § 37e, Ill.Rev.Stat. Significantly, a 1960 agreement between the Railway, the city and the University, indirectly recognized the Railway's ownership rights by resolving differences to certain property. That agreement states that each party claims some right, title or interest in the area crosshatched in red on the plat attached to the agreement; but expressly excepted from the agreement were three parcels, two of which affect the area in question here. Excepted parcel (b) is that part of Lot 156 conveyed by the University to the Railway in 1887, and excepted parcel (c), is that part of Lot 156 conveyed by University to the Railway by its 1907 deed— which is the same area previously granted to the Railway by a 1900 ordinance recognizing the University's cession of the property to the Railway. The clear implication of these exclusions from the 1960 agreement is that all the parties concerned were satisfied with the Railway's title to the portion of Lot 156 excluded from the agreement, which includes the area in question here. Based upon this record, the Comptroller rejected plaintiff's argument that "public property" was involved.

Nevertheless, the plaintiff took an identical position in the original complaint which it filed herein, on August 15, 1967. Only on April 3, 1968, at the time defendant filed its motion for summary judgment, did the plaintiff shift gears. On that date it filed its Second Amendment to the Complaint, in which it raised for the first time the theory of "dedication" upon which it now relies. It has apparently abandoned its former theories. Specifically it now claims that prior to 1869, title to Lot 156 was held in fee simple by Lake Forest University, but on April 6, 1869, the Board of Trus-

tees of the University made a resolution to dedicate Lots 155, 156 and 157 to the public "as ornamental grounds for public use". By ordinance of August 23, 1869, the City Council of Lake Forest accepted the dedication of Lot 156 "for the purpose of a public park." Both the Board's resolution and the ordinance were recorded on October 15, 1886.

Plaintiff argues that the above actions constituted a common law dedication which impressed a perpetual easement in favor of the public upon the property, which continues to this day, regardless of whatever other dispositions or use might have been made of the property by the fee owner. Thus despite the later conveyances of the property in question to the railroad, plaintiff posits that the facility will be established upon public property and consequently is in violation of subsection (15) (d).

Of course, the instant argument was not made before the Comptroller. Nor are we impressed by it. Significantly, plaintiff's documentary support for its position that the portion of lot 156 not used for a depot was once used for a park, fails to distinguish between th portion of the private driveway to be used for drive-in banking, and the portion of the lot now used for public parking, which concededly was used as a park. All that is in issue now is the portion to be provided for *"ingress and egress reasonably adequate to accommodate servicing of at least one motor vehicle at one time* without relying on any public way, street or alley *for such purpose."* (emphasis added). There is no significant evidence to indicate that such area was ever used as a public park. To argue that property is public, which has been used for railroad purposes for at least 68 years, with no title challenge in all that time to the owner, and with indirect reaffirmance of such title by the interested parties in 1960, requires a strong showing in-

deed. Were we called upon to decide this issue on the merits, we would give strong consideration to defendant Bank's theories of abandonment and equitable estoppel.

But we need not make a decision on the merits. This argument was never before the Comptroller, even though all the facts upon which plaintiff now relies to make its argument were in the administrative record.[3] We consider these new arguments to be "an afterthought, brought forward at the last possible moment to undo administrative proceedings * * *." United States v. L. A. Tucker Truck Lines, Inc., 344 U.S. 33, 73 S.Ct. 67, 97 L.Ed. 54 (1952). As stated by the Tenth Circuit in Conley Electronics Corp. v. FCC, 394 F.2d 620 (April 22, 1968), "the short answer is that the argument comes too late."

Although we do not intend to issue a ruling on the merits, we believe after reading the briefs, documents and exhibits, that plaintiff's latest argument is no more persuasive than its earlier ones. If we felt an injustice imminent, we would not hesitate to use our equitable powers in a manner which would allow the argument to be presented, either here, or before the Comptroller. But we perceive no injustice—plaintiff's argument is unpersuasive in light of the facts regarding the use which has been made of the property in issue for so many years. Plaintiff's second objection, on "public property" grounds is rejected.

Finally, in a two pronged attack, plaintiff claims that the plans for the proposed facility do not show compliance with the alleged requirements of exclusive use and control, prescribed by subsection (15) (d). First, it is argued that the motor vehicle access area will not be used solely for banking purposes, and secondly, that the plans include an inside walk-up facility, to be located in

---

3. Plaintiff has filed a number of affidavits to support its present theory, which, of course, like the argument, were not before the Comptroller. However, as mentioned above, as part of the documentary evidence submitted by plaintiff in connection with this motion, they fail to distinguish between the various portions of Lot 156 which are in issue.

the depot, which will not be segregated from the regular waiting room of the depot.

Initially, as we have already pointed out in considering the distance issue, the statutory provisions do not require that defendant control the roadway extending from the city street to the area to be controlled by defendant where the facility will be located.

The preliminary architectural drawings show an ingress and egress area "reasonably adequate to accommodate servicing of at least one motor vehicle at one time without relying on any public way, street or alley for such purpose", which will be for the exclusive use of defendant. This comports with the statutory requirements. Plaintiff's first argument is rejected.

Second, the plans show that the facility contains a walk-up window and counter area which face into the station waiting room. However, the applicable statute (§ 105(15)) does not prohibit an arrangement of the type proposed. Subsection (15)(d) states that the area containing the facility and the space for servicing at least one motor vehicle:

> " * * * shall not be used for any purpose other than the business of the maintaining bank permitted to be done at such facility by the terms hereof; *provided, however, that the provisions of this subsection 15 shall not be deemed to prevent the maintaining bank from doing such business at such facility with persons who are not operators of or passengers in motor vehicles."* (emphasis added).

Plaintiff argues that since the statute is framed in the negative, it does not authorize walk-up banking inside the building of the detached facility. The proviso admittedly is silent upon where business with walk-up customers may be transacted. Nothing was included to indicate whether such business must be done at the outside drive-up window, or if it may be done at an inside walk-up window. We think the fact that the statute does not expressly prohibit a walk-up

window inside a building is as or more significant than the fact that it does not expressly authorize such a window. Presumably, the framers of the statute saw no reason to define words as clear as "at such facility". Thus, we think the failure to expressly authorize a walk-up inside window should not prevent plaintiff from planning such a window, so long as it is part of the facility and not used for any purpose other than the business of the maintaining bank permitted to be done at the facility.

Plaintiff contends the language " * * *shall not be deemed to prevent* the maintaining bank from doing such business at such facility with persons who are not operators of or passengers in motor vehicles" (emphasis added) does not authorize such business with pedestrians because the statute does not use the words "shall authorize" such business. Such an interpretation, however, would nullify the express statutory language, and we shall not adopt it.

The only test specified by the statute is whether the area occupied by the facility is "used for any purpose other than the business of the maintaining bank". Plaintiff attempts to import a test which asks if any part of the building occupied by the facility is utilized for a purpose other than bank business. Such is the test in limitation (ii) of Chap. 16½, § 102, with reference to the maintaining bank, as set forth in note 1 supra.

But there is no warrant for applying § 102 to the type of detached facility involved here, which is authorized by § 105(15). Plaintiff argues that the two sections should be read together and that limitation (ii) of section 102 regarding the exclusive use of the room in which the facility is located, should apply as well to § 105. But in amending the Illinois Banking Act to introduce into the definition of "branch banking", the second exception covering the detached facility authorized by § 105(15), the legislature did not attempt to incorporate any of the conditions in § 102 applying to the first exception for adjacent or connected

facilities, but referred expressly to § 105 (15) in the following way:

"A place at which deposits are received or checks paid or any of a bank's other business is conducted shall not be deemed to be a branch bank, branch office or additional house, office or agency if such place is a facility established and maintained in accordance with subsection 15 of Section 5 [§ 105] of this act."

Plaintiff apparently fears that the type of facility proposed by the defendant bank will somehow allow the defendant to establish a type of branch bank not permitted by the statutes. But the relevant statute does not proscribe the proposed facility, and Section 102 is totally inapplicable thereto. Plaintiff may be worried that the alleged prime location of the proposed facility will competitively benefit defendant in a way not permitted by the statute. Aside from the fact that such considerations are exclusively within the purview of the Comptroller, we could just as easily see comparable competitive harm in another situation where a rival bank sets up a subsection (15) facility, in a structure exclusively used for the facility, in the middle of a busy shopping center. The type of structure utilized for the facility, as a rule, would seem unimportant, and under § 105(15) it is irrelevant.

The only item remaining under the exclusive use provision of subsection (15) is whether or not defendant bank's exclusive use of the area occupied by its facility should extend to a lobby through which its customers must pass to reach the counter space and walk-up window. A separate lobby was not included in the preliminary drawings because defendant was not certain as to whether the law required such a separation. However, it stands ready to include such a partition and a separate entrance as well if that be deemed necessary by the Court.

The statute states " * * * the area necessary *for that purpose* shall not be used for any purpose other than the business of the maintaining bank * *." (emphasis added). "That purpose" refers back to the words "the facility shall be established and maintained in or on an area of such size and with provisions for ingress and egress * * *." Thus it appears that the area needed for the facility and for ingress and egress (i. e. the lane for servicing at least one motor vehicle) must be used exclusively for bank business.

The present preliminary plans would require bank customers to use the entrances and lobby of the station, in common with non-bank customers. Some lobby area will be necessary in order to utilize the walk-up window. The lobby space needed for such purpose must be used exclusively for banking purposes under the statute. Thus, we think the inside lobby area to be used by the bank must be separated in some manner from the remainder of the station lobby, and a separate entrance must be constructed to service it alone.

We recognize that to require a separate lobby and entrance, in effect would impute the *effect* of limitation (ii) in § 102, discussed *supra,* into § 105(15), on this set of facts. Nevertheless, to require separate facilities here is not a result of applying § 102, but only is a means of complying instead with the exclusive use provision of § 105(15).

At the Administrative Hearing, plaintiff's counsel admitted with specific reference to this issue that " * * * they can construct facilities on this lot which will conform to that law. * * *" (Transcript of Hearing, p. 18).

The Comptroller's approval, of course, was only preliminary, based upon preliminary drawings, and issuance of the final certificate required before the facility could open must await completion of construction and notification thereof. Thus, by requiring the separate lobby and entrance at this stage before construction has commenced, we are able to correct the minor defect extant in the preliminary plans.

The defendant's motion for summary judgment is granted, the Comptroller's approval is affirmed with the slight modification noted above, and the defendant Bank is ordered to submit modified plans to the Comptroller in accordance with this opinion.

