WESTERN STATE BANK OF ST. PAUL, Plaintiff,

v.

MARQUETTE BANK MINNEAPOLIS, N.A. and Robert L. Clarke, Comptroller of the Currency, Defendants.

Civ. No. 4–89–1074.

United States District Court, D. Minnesota, Fourth Division.

April 18, 1990.

Gary Hansen, Peter E. Hintz, Doherty, Rumble & Butler, P.A., St. Paul, Minn., for plaintiff.

Brian Palmer, John Cooney, Scott Wilson, Karen Hersch, Dorsey & Whitney, Minneapolis, Minn., for defendants.

## MEMORANDUM AND ORDER

MacLAUGHLIN, District Judge.

This matter is before the Court on defendants' motion to dismiss for failure to state a claim or, in the alternative, for summary judgment. The motion for summary judgment will be granted.

FACTS

There is no dispute about the facts in this case.[1] Defendant Marquette Bank Minneapolis, N.A. (Marquette) is a national banking association. On September 28, 1989, Marquette submitted an application to the Midwestern District Office of the Comptroller of the Currency (OCC) to establish a branch office in Oakdale, Minnesota.[2] On the same date, Marquette pub-

---

1. Although plaintiff did not make a cross motion for summary judgment, it has specifically stated that there are no material facts in dispute and that denial of defendants' motions will in effect be a grant of summary judgment in plaintiff's favor. Plaintiff's Memorandum of Law at 3–4.

2. The OCC is a bureau of the United States Treasury Department charged with the supervision and regulation of national banks. 12 U.S.C. § 1 *et seq.*

lished notice of its application to establish an Oakdale branch.

Plaintiff Western State Bank of St. Paul (Western) operates a branch office approximately 350 feet from Marquette's proposed Oakdale branch. Western objected to Marquette's application on the ground that the establishment of an Oakdale branch by Marquette would violate state law restrictions on the number of operating branch offices.

Under 12 U.S.C. § 36(c), the OCC may approve a national bank's application to open a branch in a given state, subject to the restrictions imposed on state banks by state law.[3] Under Minn.Stat. § 47.52, state banks are authorized to "establish and maintain not more than five detached facilities." A "detached facility" is defined at Minn.Stat. § 47.51 as "any permanent structure ... located separate and apart from the main banking house which is not an 'extension of the main banking house' ... that serves as a drive-in or walk-up facility, or both."

State banks are also authorized to acquire branches through merger, consolidation or purchase of another state bank or national banking association. The five branch limitation does not restrict the number of branches acquired in two situations: (1) where the acquiring bank has its main office in the Twin City metropolitan area and the acquired branch is also within the metropolitan area, or (2) the acquisition is found necessary by the Minnesota Commissioner of Commerce to prevent the probable failure of a troubled institution.

(b) ... *[N]otwithstanding ... the limitations on number of facilities and consent requirements contained in section 47.52,* a state bank whose main banking office is located within [the Twin Cities metropolitan area] may apply to the commissioner ... to acquire another state bank or national banking associa-

tion and its detached facilities through merger, consolidation or purchase of assets and assumption of liabilities and operate them as detached facilities of the successor bank if each resulting detached facility is located within [the Twin Cities metropolitan area].

(c) Where the commissioner [of commerce] has determined that a merger, consolidation or purchase of assets and assumption of liabilities is necessary and in the public interest to prevent the probable failure of a state bank or national banking association, *the limitations on location and number of detached facilities in section 47.52 shall not apply to the establishment of a detached facility directly resulting from such acquisition.*

Minn.Stat. § 49.34, subd. 2(b), (c) (emphasis added).

Marquette had thirteen branch offices at the time it filed an application to open an Oakdale branch. Six had been acquired through merger with banks in the Twin Cities metropolitan area as specified in Minn.Stat. § 49.34, subd. 2(b). Four were obtained by acquisition of a failing institution pursuant to Minn.Stat. § 49.34, subd. 2(c). The remaining three branches were "de novo" branches founded by Marquette under the authority of Minn.Stat. § 47.52.

The question raised by Marquette's application was whether branches acquired pursuant to section 49.34, subd. 2(b) and (c) were to be counted against the five branch limit imposed by section 47.52. If they were, the Marquette's application could not be granted because banks with five or more branches may obtain additional branches only through acquisition under section 49.34, subd. 2. If they were not, the Oakdale branch constituted Marquette's fourth de novo branch and was allowable.

---

**3.** Section 36(c) provides in relevant part:

A national banking association may, with the approval of the Comptroller of the Currency, establish and operate new branches ... *if such establishment and operation are at the time authorized to State banks by the statute law of the State in question* by language spe-

cifically granting such authority affirmatively and not merely by implication or recognition, and subject to the restrictions as to location imposed by the law of the State on State banks.

(Emphasis added.)

In its objection, Western asserted that the OCC should interpret the statute restrictively. The OCC rejected that argument and approved the application. Western subsequently wrote the Minnesota Commissioner of Commerce to request an interpretation of the statute. Affidavit of John A. Cooney, Exh. I (November 17, 1989 letter to Michael A. Hatch, Commissioner of Commerce, from Stephen T. Braun, counsel to Western).

The Department of Commerce interprets the statute the same way it is interpreted by the OCC. Cooney Aff. Exh. H (January 10, 1990 letter to Stephen T. Braun from James G. Miller, Deputy Commissioner of Commerce). The Department of Commerce noted that Western's question was not explicitly addressed by the relevant statutes. However, it noted that "one significant inequity" existed under the interpretation advocated by Western.

> There seems to be no discernible policy reason why a bank which has first established five de novo detached facilities under the provisions of Minn.Stat. § 47.52 should be permitted to acquire an unlimited number of additional detached facilities by merger and acquisition, while a bank which has established five detached facilities by merger and acquisition should not then be permitted to establish up to five de novo detached facilities. Such an outcome implies a competitive advantage which reasonably would not be intended by the legislature.

Cooney Aff. Exh. H. Based on this reading of the Legislature's intent, the Department of Commerce interpreted the limitations in section 47.52 to be unaffected by acquisitions pursuant to section 49.34, subd. 2(b) and (c). *Id.* The Department had previously been asked to address the same question by counsel for Marquette's parent corporation and took the same position. Cooney Aff. Exh. J (August 2, 1984 letter from David A. Shern, Deputy Commissioner of Commerce).

On December 8, 1989, prior to receiving its response from the Department of Commerce, Western filed this suit against Marquette and Robert L. Clarke, Comptroller of the Currency, seeking *inter alia,* (1) a declaratory judgment determining that the OCC's approval of Marquette's application was arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law, (2) an injunction requiring the OCC to reverse its approval of Marquette's application and (3) an injunction enjoining Marquette from operating the Oakdale branch.

Marquette opened its Oakdale branch on December 11, 1989.

## DISCUSSION

Defendants move to dismiss the complaint for failure to state a claim or, in the alternative, for summary judgment. Because matters outside the pleadings have been presented to the Court, defendants' motion is more appropriately analyzed as one for summary judgment under Fed.R. Civ.P. 56. A movant is not entitled to summary judgment unless the movant can show that no genuine issue exists as to any material fact. Fed.R.Civ.P. 56(c). In considering a summary judgment motion, a court must determine whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The role of a court is not to weigh the evidence but instead to determine whether, as a matter of law, a genuine factual conflict exists. *AgriStor Leasing v. Farrow,* 826 F.2d 732, 734 (8th Cir.1987). "In making this determination, the court is required to view the evidence in the light most favorable to the nonmoving party and to give that party the benefit of all reasonable inferences to be drawn from the facts." *AgriStor Leasing,* 826 F.2d at 734. When a motion for summary judgment is properly made and supported with affidavits or other evidence as provided in Fed.R.Civ.P. 56(c), then the nonmoving party may not merely rest upon the allegations or denials of the party's pleading, but must set forth specific facts, by affidavits or otherwise, showing that there is a genuine issue for trial. *Lomar Wholesale Grocery, Inc. v.*

*Dieter's Gourmet Foods, Inc.,* 824 F.2d 582, 585 (8th Cir.1987), *cert. denied,* 484 U.S. 1010, 108 S.Ct. 707, 98 L.Ed.2d 658 (1988). Moreover, summary judgment must be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

## I. Standard of Review

■ Western argues that the Court should review the OCC's administrative decision de novo because the question at issue is a purely legal one: whether branches acquired pursuant to section 49.34, subd. 2(b) and (c) are to be counted against the five branch limit established by section 47.-52. The law provides, however, that the courts must defer to an administrative agency's interpretation of a statute within the agency's area of expertise, so long as the agency's interpretation is reasonable. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984).

"[E]ven in considering purely legal issues, courts should grant great deference to the reasonable interpretations of statutes by the agencies charged with administering those statutes." *Independent Community Bankers Ass'n of South Dakota, Inc. v. Board of Governors of the Federal Reserve System,* 838 F.2d 969, 974 (8th Cir.1988). This principle is illustrated by *Montgomery National Bank v. Clarke,* 882 F.2d 87 (3d Cir.1989). In that case, the OCC approved a national bank's application to establish a branch bank. Approval required the OCC to interpret and apply a New Jersey statute which prohibited a bank from opening a branch office in a small town where another bank has its principal office unless permitting the branch to open would serve the "public interest." The United States Court of Appeals for the Third Circuit deferred to the OCC's legal interpretation of the meaning of the "public interest" for the purposes of the New Jersey statute. The court noted that the federal agency was interpreting state, not federal, law. Nevertheless, the court concluded that the agency's interpretation should be accorded deference

> if the issue raised by the unsettled question of state law falls squarely within the federal agency's field of expertise and the state courts or state agency charged with administering the state statute have not ruled out the interpretation of the statute proffered by the federal agency.

882 F.2d at 92.

The case cited by Western in support of its position is *Mid–West Nat'l Bank of Lake Forest v. Comptroller of the Currency,* 296 F.Supp. 1223 (N.D.Ill.1968). That case involved similar facts. A bank challenged an OCC order approving an application to establish a drive-up banking facility. The operative question was whether the proposed facility complied with state law. In contrast to the statute at issue here, however, the statute at issue in that case required the applicant to provide for ingress and egress for the proposed drive-up facility "without relying on any public way, street or alley for such purpose." 296 F.Supp. at 1227. The interpretation of that statute did not involve expertise in the law governing banking, as the district court specifically found. 296 F.Supp. at 1226. The courts accord deference only to agency interpretations of statutes within the agency's field of expertise.

The statute at issue in this case regulates banking. Although it is state law, it provides the OCC with that agency's rule of decision under 12 U.S.C. § 36(c) and must be considered to fall within the OCC's field of expertise. Thus, the OCC's interpretation of the statute must be accorded deference, so long as the interpretation is a reasonable one.

## II. Whether the OCC's Interpretation is a Reasonable One

■ The statutes governing the establishment of bank branches can be summarized as follows. Section 47.52 allows banks to establish and maintain "not more than five detached facilities," with the prior

approval of the commissioner of commerce. Section 49.34, subd. 2(b) and (c), excepts from the five branch limit branches acquired by merger, consolidation or purchase of an existing bank within the Twin Cities metropolitan area or branches acquired by merger, consolidation or purchase of a troubled institution.

Section 49.34 speaks only of the effect of the five branch limit on the addition of new branches by merger, consolidation or purchase. Neither section 49.34 nor section 47.52 explicitly addresses the question raised by Marquette's application: whether branches acquired pursuant to section 49.34, subd. 2(b) and (c) count against the five branch limit when a bank subsequently applies to open a de novo branch.

The OCC treated section 47.52 as a limitation on de novo branches which is not affected by branches acquired pursuant to section 49.34, subd. 2(b) and (c). Marquette had only three de novo branches at the time it applied to open its Oakdale branch. Thus, the Oakdale branch constituted Marquette's fourth de novo branch and the OCC approved the application.

This Court must defer to the OCC's interpretation of sections 47.52 and 49.34 so long as that interpretation is a reasonable one. The Court finds that the OCC clearly has placed a reasonable construction on those provisions. While the restrictive interpretation urged by Western is not illogical, the OCC's interpretation has two important advantages. First, the OCC interpretation avoids creating a competitive advantage for banks which established five de novo branches prior to acquiring branches by merger, consolidation or purchase. As the Department of Commerce has noted:

There seems to be no discernible policy reason why a bank which has first established five de novo detached facilities under the provisions of Minn.Stat. § 47.52 should be permitted to acquire an unlimited number of additional detached facilities by merger and acquisition, while a bank which has established five detached facilities by merger and acquisition should not then be permitted to establish up to five de novo detached facilities. Cooney Aff.Exh. H. Second, it is consistent with the interpretation of the Minnesota Department of Commerce, which regulates the state banks. The undoubted intent of 12 U.S.C. § 36(c) is to have the establishment of branch offices of national banks governed by the same rules which govern the establishment of branch offices by state banks.

Because the OCC's interpretation of sections 47.52 and 49.34 is a reasonable one, the Court will grant summary judgment in favor of the defendants and dismiss Western's action for declaratory and injunctive relief.[4]

Accordingly, based on the foregoing, and upon all the files, records and proceedings in this case,

IT IS ORDERED that defendants' motion for summary judgment is granted.

LET JUDGMENT BE ENTERED ACCORDINGLY.

---

**4.** The Court would reach the same conclusion if this matter was before it on a purely de novo review of the OCC's administrative decision.