MARSHALL & ILSLEY CORPORATION,
et al., Plaintiffs-Appellants,

v.

John G. HEIMANN, Comptroller of the
Currency of the United States, et al.,
Defendants-Appellees.

No. 80–2251.

United States Court of Appeals,
Seventh Circuit.

Argued April 9, 1981.

Decided June 12, 1981.

As Corrected June 19, 1981.

Rehearing and Rehearing In Banc
Denied August 26, 1981.

Bank of a new branch bank at the office formerly operated by Midland. These transactions were approved by the Comptroller of the Currency of the United States. Plaintiffs, three Milwaukee banks and the bank holding companies that own them, filed this action against the Comptroller, First Bank, and First Bank System, Inc., the holding company that owns First Bank. Plaintiffs allege that the Comptroller violated 12 U.S.C. § 36(c) and Wis.Stat. § 221.04(1)(j) by permitting First Bank to retain the former Midland office as a branch bank. Plaintiffs also allege that the acquisition of Midland by First Bank was, in reality, an acquisition by First Bank System, and thus, was a holding company acquisition over which the Comptroller had no jurisdiction and which the Comptroller had no authority to approve.

The district court dismissed plaintiffs' original complaint for lack of standing and failure to state a claim. The district court similarly dismissed plaintiffs' amended complaint for lack of standing. We affirm the dismissal of plaintiffs' complaints.

I

█ The parties disagree as to the facts properly before this court upon review of the district court's orders dismissing plaintiffs' complaints. Plaintiffs have moved to strike portions of First Bank's brief and appendix on the ground that they incorporate contested factual matters that properly were excluded by the district court in resolving the threshold issues of standing and jurisdiction. In particular, plaintiffs object to defendants' submission of materials supporting the Comptroller's finding that emergency measures were necessary in order to prevent the failure of Midland. We agree that only the record established in the district court, and not additional materials submitted by the Comptroller to this court on appeal, are properly before this court. We, therefore, draw no conclusions from the additional materials submitted and con-

James Urdan, Quarles & Brady, Richard C. Ninneman, Whyte & Hirschboeck, S. C., Milwaukee, Wis., for plaintiffs-appellants.

David A. Ranheim, Minneapolis, Minn., Lise Haupt, Comptroller of Currency, Washington, D. C., for defendants-appellees.

Before SWYGERT and SPRECHER, Circuit Judges, and HOFFMAN, Senior District Judge.*

SPRECHER, Circuit Judge.

This case arises out of the purchase of assets and assumption of liabilities of the Midland National Bank ("Midland") in Milwaukee, Wisconsin by defendant First Bank (N.A.) of LaCrosse, Wisconsin ("First Bank") and the establishment by First

* Honorable Walter E. Hoffman, Senior District Judge for the Eastern District of Virginia is sitting by designation.

fine our review to the following uncontested facts.

By decision dated July 23, 1977, the Comptroller approved the application of First Bank[1] to purchase the assets and assume the liabilities of Midland.[2] At that time, Midland was the fourth largest bank in Wisconsin. First Bank was considerably smaller, but was and is owned by First Bank System, Inc., of Minneapolis, Minnesota, a bank holding company that controls many banks, with total deposits exceeding $6 billion. The Comptroller's decision was based upon his finding that, from the fall of 1975 through the spring of 1977, Midland suffered a severe and continuing deterioration in its asset structure, principally due to real estate loan problems. The Comptroller reasoned that the severity of the loan problems, as well as the volatility of the bank's deposit structure, threatened Midland's survival unless Midland received a massive injection of capital. The Comptroller considered First Bank's offer to purchase Midland a good solution that would avoid a bank failure and would insure uninterrupted services to Midland's customers.

Because the Comptroller regarded Midland's situation as an emergency, the Comptroller, pursuant to 12 U.S.C. § 181,[3] waived the requirement of shareholder approval and waived certain other requirements of bank mergers, pursuant to the Bank Merger Act, 12 U.S.C. § 1828(c).[4] The Comptroller also determined that the retention of Midland's existing office as a branch of First Bank was consistent with Wisconsin's emergency branch banking statute, Wis. Stat. § 221.04(1)(j)2, which is made applicable to national banks by 12 U.S.C. § 36(c).[5]

---

1. At the time of this transaction, First Bank was named "National Bank of Wisconsin in LaCrosse." After the Midland transaction, the name was changed to "First Bank (N.A.)."

2. According to the affidavit of Robert Bloom, First Deputy Comptroller of the Currency, the Comptroller's staff was advised of a tentative understanding between First Bank and Midland on July 20, 1977. On July 22, 1977, members of the Comptroller's staff met with representatives of plaintiff Marshall & Ilsley Bank. Marshall & Ilsley was given until Sunday, July 24, to advise the Comptroller if it had any interest in acquiring Midland. Marshall & Ilsley alleges that the time permitted to consider the acquisition was so unreasonable as to render it a sham offer. The record before us does not allow us to decide the likelihood that Marshall & Ilsley would or could have acquired Midland.

 Meanwhile, on July 23, 1977, Midland and First Bank signed the purchase and assumption agreement. First Bank was to receive all real and personal property and all intangible assets of Midland in exchange for assuming the deposit and other business liabilities of Midland plus paying approximately $13 million in cash. The agreement was contingent on receiving the Comptroller's approval, which was granted on July 23.

3. 12 U.S.C. § 181 provides in pertinent part:
 Any association may go into liquidation and be closed by the vote of its shareholders owning two-thirds of its stock. If the liquidation is to be effected in whole or in part through the sale of any of its assets to and the assumption of the deposit liabilities by another bank, the purchase and sale agreement must also be approved by its shareholders owning two-thirds of its stock *unless an emergency exists and the Comptroller of the Currency specifically waives such requirement for shareholder approval.*
 (emphasis added)

4. The Bank Merger Act, 12 U.S.C. § 1828(c), which deals with determination of the antitrust aspects of bank mergers, requires the Comptroller to follow certain procedures, including notice to and solicitation of reports from other agencies and the Attorney General, before allowing a national bank to acquire the assets and assume the liabilities of another national bank. The Bank Merger Act allows waiver of these requirements if the Comptroller "finds that it must act immediately in order to prevent the probable failure of one of the banks involved...." 12 U.S.C. § 1828(c)(3), (4), (6). In particular, 12 U.S.C. § 1828(c)(6) provides that in an emergency, the transaction may be consummated immediately upon approval by the Comptroller.

5. The authority of the Comptroller to approve branches of national banks is found in 12 U.S.C. § 36, which incorporates state limitations on branch banking. 12 U.S.C. § 36(c) provides in pertinent part:
 (c) A national banking association may, with the approval of the Comptroller of the Currency, establish and operate new branches: ... (2) at any point within the State in which said association is situated, if such establishment and operation are at the time authorized to State banks by the statute law of the State in question by language specifically granting such authority affirmatively and not merely by implication or recognition,

In January, 1978, plaintiffs filed this action. The original complaint alleged that the Comptroller's approval of the establishment of a branch of First Bank in Milwaukee violated the applicable statutes which limit the establishment of branches by national banks. The original complaint also alleged that the Comptroller had exceeded his jurisdiction and had violated the Bank Holding Company Act, 12 U.S.C. § 1842, in purporting to approve an acquisition by First Bank which was actually an acquisition by First Bank System, Inc., a bank holding company located outside Wisconsin.

The initial decision of the district court, dated September 16, 1978, dismissed the branch banking claim in plaintiffs' complaint without prejudice. The court held that plaintiffs lacked standing with regard to the branch bank issue because they failed to allege "injury in fact." The district court dismissed the Bank Holding Company Act claim with prejudice, holding that no private right of action against the Comptroller could be derived from the Bank Holding Company Act.

Plaintiffs filed an amended complaint limited to the branch banking issue. By order dated June 30, 1980, the district court dismissed the amended complaint for lack of standing.

## II

We deal first with plaintiffs' standing to assert the branch banking issues raised in plaintiffs' amended complaint.[6] Plaintiffs' amended complaint sets forth two alternative theories of how the Comptroller violated federal and state branch banking statutes: Count I alleges that allowing First Bank to acquire the former Midland facility as a branch violated 12 U.S.C. § 36 and the Wisconsin emergency branch banking statute, Wis.Stat. § 221.04(1)(j)2, because there was no "emergency" at the time the Comptroller acted; Count II alleges that, even if there was an emergency, the Comptroller violated Wis.Stat. § 221.04(1)(j)2 by failing to first offer plaintiffs the opportunity to acquire Midland.

As Justice Douglas stated in *Association of Data Processing Service Organizations v. Camp*, 397 U.S. 150, 151, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970), "[g]eneralizations about standing to sue are largely worthless as such." One commentator has noted that the concept of standing is "among the most amorphous in the entire domain of public law." Hearings on S.2097 before the Subcommittee on Constitutional Rights of the Senate Judiciary Committee, 89th Cong., 2d Sess. 465, 498 (1966) (statement of Prof. Paul A. Freund), *quoted in Flast v. Cohen*, 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968). In order to avoid confusion and inconsistency in analyzing standing questions, it is necessary to focus on the precise parties, injuries, interests, and statutes involved. Therefore, we must narrow our focus to the specific issue of standing of competitors to challenge agency action which results in allegedly illegal competition.

---

and subject to the restrictions as to location imposed by the law of the State on State banks. . . .

**6.** The two branch banking claims in plaintiffs' amended complaint were contained in Count I of plaintiffs' original complaint. Count I of the original complaint was dismissed for lack of standing because plaintiffs failed to adequately allege injury in fact flowing from First Bank's acquisition of Midland, the operation of the former Midland facility as a branch bank, and the failure to provide plaintiffs with an opportunity to acquire Midland's operations. *See United States v. SCRAP*, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972).

Plaintiffs subsequently amended their complaint to include allegations of: (1) competitive injury from the allegedly illegal First Bank branch, and (2) injury from the failure to offer Midland to plaintiffs, since one or more of them might have acquired Midland if they had been given a fair opportunity to do so. The district court found, however, that competitor status, in the absence of "injury in fact," was insufficient to confer standing to challenge the Comptroller's decision. The district court also found that the offer requirement of Wis.Stat. § 221.04(1)(j)2 was not binding on the Comptroller, so plaintiffs had no cognizable claim against the Comptroller under that statute.

The general test for standing was first articulated by the Supreme Court in three cases involving competitors' challenges to Comptroller rulings allowing national banks to enter the competitors' fields. *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970) (data processing); *Arnold Tours v. Camp*, 400 U.S. 45, 91 S.Ct. 158, 27 L.Ed.2d 179 (1970) (travel services); *Investment Company Institute v. Camp*, 401 U.S. 617, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971) (mutual investment funds). The test enunciated in these cases gives meaning to the Administrative Procedure Act's grant of standing to persons "aggrieved by agency action within the meaning of a relevant statute . . . ." 5 U.S.C. § 702.

■ The test has two prongs. The first part of the test requires that "the plaintiff alleges that the challenged action has caused him injury in fact, economic or otherwise." *Data Processing*, 397 U.S. at 152, 90 S.Ct. at 829. The second part of the test requires that "the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." 397 U.S. at 153, 90 S.Ct. at 829.

A

■ We now consider the first requirement of standing, that there be an "injury in fact." This requirement assures satisfaction of the constitutional requirement of a "case or controversy." *See Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 37–38, 96 S.Ct. 1917, 1923–24, 48 L.Ed.2d 450 (1976). Plaintiffs' original complaint was dismissed because it did not include any allegations of injury in fact, economic or otherwise. The court refused to construe the complaint as alleging the adverse effect necessary to give plaintiffs standing and, consequently, dismissed with leave to amend.[7]

In their amended complaint, plaintiffs allege that plaintiff banks and Midland were within a radius of one-half mile of each other and competed actively. Plaintiffs allege damages resulting from "illegally acquired changes in the competitive environment" caused by First Bank's acquisition of Midland.[8] The district court held that, although plaintiffs alleged that they and the new First Bank branch at the former Midland location were competitors, "plaintiffs' amended complaint still contains no allegation of any concrete or identifiable injury,

---

**7.** While the district court doubted that plaintiffs could show that they were injured by the Comptroller's failure to offer them the opportunity to buy Midland, the court indicated that plaintiffs might be able to establish some type of competitive injury:

> [I]t is possible that plaintiffs could establish that they have suffered or expect to suffer an economic injury by the Comptroller's intervention into the Milwaukee banking field by alleging facts tending to show that as a consequence of his action, there was an improvement in Midland's ability to compete with the plaintiff banks and tending to show that the defendant holding company gained a competitive advantage over the plaintiff holding companies.

*Marshall & Ilsley Corp. v. Heimann*, No. 78–C–42, slip op. at 12 (W.D.Wis. Sept. 18, 1978).

**8.** Plaintiffs claim that they were injured in the following respects:

> (a) First Bank System and First Bank were permitted to establish a branch bank office in the immediate proximity of plaintiffs and thereby to compete with plaintiffs through a Milwaukee office in direct violation of the

laws regulating branch bank locations; (b) First Bank System and First Bank were permitted to expand their commercial banking operations into the Milwaukee market and business area which is substantially removed from their prior areas of operation, while similar expansion opportunities are denied to plaintiffs; and (c) the Comptroller's action created a double standard under which special rights and privileges have been granted to First Bank and First Bank System which are contrary to law, thereby enabling First Bank System to create illegally a multi-state affiliation of banking institutions with total assets substantially exceeding the combined assets of all plaintiffs.

Amended Complaint ¶ 27. Plaintiffs' amended complaint also claims competitive injury can be inferred from advertisements stating that the former Midland facility, because it is now part of First Bank System, would be able to "introduce a level of competition unprecedented in the history of Wisconsin banking." Amended Complaint ¶ 28.

whether economic or otherwise, caused them by the defendants' acts unless competition itself is somehow considered injurious." *Marshall & Ilsley Corp. v. Heimann,* No. 78–C–42, slip op. at 4 (W.D.Wis. June 30, 1980).

■ The Supreme Court has held, however, that an administrative agency's authorization of an allegedly illegal competitor or form of competition *does* constitute injury to competitors for standing purposes. In *Data Processing,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), *Arnold Tours,* 400 U.S. 45, 91 S.Ct. 158, 27 L.Ed.2d 179 (1970), and *Investment Company Institute,* 401 U.S. 617, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971), the Comptroller gave national banks permission to enter new areas of operation. "Injury in fact" flowed from the economic harm caused by an additional competitor. In *Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), the Court reaffirmed the *Data Processing* holding that harm to competitive position comprises "injury in fact":

> In *Data Processing,* the injury claimed by the petitioners consisted of harm to their competitive position in the computer-servicing market through a ruling by the Comptroller of the Currency that national banks might perform data-processing services for their customers.... These palpable economic injuries have long been recognized as sufficient to lay the basis for standing, with or without a specific statutory provision for judicial review.

405 U.S. at 733–34, 92 S.Ct. at 1364–65 (footnote omitted).

Defendants argue that *Data Processing* and other cases challenging decisions by the Comptroller are distinguishable because, in those cases, competitive injury was readily inferred as a result of the Comptroller's authorization of *new* branches or *new* forms of competition.[9] Here, plaintiffs challenge the change of ownership of an existing bank. According to the district court, where there is "replacement" rather than "new" competition, competitive injury cannot be "assumed from the situation itself or inferred from plaintiffs' allegations." *Marshall & Ilsley Corp. v. Heimann,* No. 78–C–42, slip op. at 11 (W.D.Wis. Sept. 18, 1978). But, while the establishment of a new branch bank where there was no bank is certainly a more obvious form of competitive harm than the transformation of an existing bank into a branch bank, we do not find the differences between "new" and "replacement" competition decisive.

■ According to the cases involving "new" competition, if First Bank had attempted to establish a new branch in Milwaukee, plaintiffs would have standing to challenge the legality of that new branch; competitive injury would be assumed to flow from a new source of competition.[10] In this case, there can be no doubt that conversion of Wisconsin's fourth largest bank into a branch of a bank located in a different city and owned by an enormous bank holding company represents a change in the competitive configuration of Milwaukee's banking community. To hold that plaintiffs would satisfy the "injury in fact" requirement for purposes of challenging a totally new branch, no matter how small, but that plaintiffs must allege more specific and identifiable harm when the allegedly illegal branch is an acquired bank, would be absurd. We find that the allegations of competitive harm in plaintiffs' amended complaint are sufficient to satisfy the "injury in fact" prerequisite to standing. *Cf. Leuthold v. Camp,* 273 F.Supp. 695 (D.Mont.

---

**9.** *See, e. g., State Bank of Fargo v. Merchants Nat'l Bank & Trust Co. of Fargo,* 451 F.Supp. 775, 784 (D.N.D.1978), *aff'd,* 593 F.2d 341 (8th Cir. 1979) (establishment of two new customer electronic funds transfer centers); *Marion Nat'l Bank of Marion v. Van Buren Bank,* 418 F.2d 121, 123 (7th Cir. 1969) (opening of new banking facility).

**10.** Many opinions involving competitors' challenges to the establishment of allegedly illegal branches do not even discuss the standing issue. Recognition of competitive injury is implicit. *See State Bank of Rensselaer v. Heimann,* 619 F.2d 679 (7th Cir. 1980); *First Union Bank & Tr. Co. of Winamac v. Heimann,* 600 F.2d 91 (7th Cir.), *cert. denied,* 444 U.S. 950, 100 S.Ct. 423, 62 L.Ed.2d 320 (1979).

1967), *aff'd*, 405 F.2d 499 (9th Cir. 1969) (competitor challenge allowed although Comptroller's action did not increase the number of competitive banking facilities).

### B

 A showing of an injury in fact is a necessary, but not a sufficient, prerequisite for standing. Plaintiffs also must satisfy the second prong of the standing test, the "zone of interests" requirement. To satisfy this requirement, plaintiffs must show that the relevant statutes were meant to protect them from the type of competition threatened by defendants' actions. The "zone of interests" requirement is a prudential limitation, which has not been extensively developed by the Supreme Court since *Data Processing*. For this reason, the district court, in dismissing plaintiffs' original complaint, held that the requirements for standing are satisfied by a showing of an injury in fact, economic or otherwise, and that plaintiffs need not establish that they come within any "zone of interests."[11] We disagree.

This circuit consistently has required satisfaction of the zone of interests test for standing. *Bradford School Bus Transit, Inc. v. Chicago Transit Authority*, 537 F.2d 943, 946 (7th Cir. 1976), *cert. denied*, 429 U.S. 1066, 97 S.Ct. 797, 50 L.Ed.2d 784 (1977); *Apter v. Richardson*, 510 F.2d 351, 353 (7th Cir. 1975). Although the Supreme Court has not elaborated on the zone of interests standard recently, the standard is still referred to by the Supreme Court as an element of the test for standing.[12] We further are persuaded of the standard's continuing vitality by the thoughtful and detailed discussion in *Control Data Corp. v. Baldridge*, No. 80–1143, slip op. at 13–17

(D.C.Cir. March 25, 1981). *See also Tax Analysts & Advocates v. Blumenthal*, 566 F.2d 130, 138–43 (D.C.Cir. 1977), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978). Therefore, although we find, contrary to the district court, that plaintiffs have alleged a personal stake and interest in the litigation which amounts to an "injury in fact," the standing issue is by no means decided. We must also decide whether the particular interest asserted by plaintiffs is arguably protected by the particular statutory provision involved. *See Tax Analysts*, 566 F.2d at 140.

We apply the zone of interests analysis separately to each count and each statute involved.

### 1

In Count I of their amended complaint, plaintiffs claim that there was no "emergency" at Midland—that Midland was not in danger of failing. In order to satisfy the zone of interests test for Count I, plaintiffs' interests must be protected by the relevant emergency provisions. Only if plaintiffs have standing to dispute the emergency determination, do the particular banking claims in Count I become an issue.[13] Both state and federal statutory provisions concerning emergency measures that are permitted when a bank is near failure are involved here. While plaintiffs base their standing arguments on the state branch banking law, the federal emergency provisions invoked by the Comptroller also are relevant in determining the interests protected by the emergency branching statute.

### a

 First, we deal with the federal emergency statutes. The Comptroller may

---

11. The district court went on to hold that plaintiffs had failed to allege an "injury in fact." Thus, even if the district court had acknowledged that the zone of interests test is still viable, it did not have to reach that issue. *See Sierra Club v. Morton*, 405 U.S. at 733 n.5, 92 S.Ct. at 1365 n.5.

12. *See* cases cited in *Control Data Corp. v. Baldridge*, No. 80–1143, slip op. at 16 n.12 (D.C. Cir. March 25, 1981).

13. Wisconsin branch banking law prohibits establishment of branch banks except as provided by Wis.Stat. §§ 221.04(1)(i), (j), and (*l*). Wis.Stat. § 221.04(1)(f). If, as plaintiffs allege, there was no emergency, the Wisconsin branch banking laws and 12 U.S.C. § 36 clearly were violated, since only the emergency exception, Wis.Stat. § 221.04(1)(j)2, could possibly apply to permit First Bank's acquisition of Midland.

waive shareholder approval of the sale of assets and assumption of liabilities of a failing bank and may allow immediate consummation of the transaction pursuant to 12 U.S.C. §§ 181 and 1828(c).[14] Under each of these statutes, we find that plaintiffs' interests in preventing illegal competition are not within the zone of interests intended to be protected by the statutes.

The interests protected by 12 U.S.C. § 181 are clearly those of the shareholders of a bank being liquidated and, in situations where a bank is failing, those of shareholders and bank customers.[15] The reason for allowing waiver of shareholder approval is to prevent "delays in rendering financial assistance to national banks in emergency situations." Hearings on H.R. 6092 and H.R. 6093 before Subcommittee No. 2 of the House Committee on Banking and Currency, 86th Cong., 1st Sess. 39 (1959).

From this brief analysis of the statute, it is clear that competitors of an allegedly failing bank, unlike shareholders, are not among those whose interests are protected by 12 U.S.C. § 181. Plaintiffs, therefore, do not have standing to challenge the Comptroller's determination of an emergency based on that provision.

The other federal statutory provision involving the Comptroller's determination of an emergency is 12 U.S.C. § 1828(c). This portion of the Bank Merger Act concerns the antitrust implications of bank mergers. It establishes procedures "for the review of proposed bank mergers so as to eliminate the necessity for the dissolution of merged banks." H.Rep.No.1221, 89th Cong., 2d Sess. 1, *reprinted in* 1966 *U.S.Code Cong. & Ad.News* 1860. These procedures may be expedited when the responsible agency finds "that it must act immediately in order to prevent the probable failure of one of the banks involved." 12 U.S.C. § 1828(c)(3), (4), (6).

■ Under the Bank Merger Act, the Comptroller's determination of an emergency eliminates procedures for pre-merger examination of the antitrust implications of bank mergers. In order to fall within the zone of interests of 12 U.S.C. § 1828(c), plaintiffs must represent the particular competitive interest addressed by the statute—the interest in preventing antitrust violations. Here, there is no allegation that First Bank's purchase of Midland violates any antitrust laws. Plaintiffs' "interest" is in avoiding competition from an illegal branch. This interest is very different from an interest in avoiding monopolization of the Milwaukee banking community.

In *Control Data Corp. v. Baldrige*, No. 80–1143, slip op. at 24–27 (D.C.Cir. March 25, 1981), the court held that plaintiffs are not within the zone of interests of a statute where their competitive interest does not match the particular interest in competition protected by that statute. Here, plaintiffs' general interest in competition does not match the antitrust interest of the statute. Therefore, we find that plaintiffs do not have standing to challenge the Comptrol-

---

14. *See* notes 3, 4, *supra.*

15. It is unnecessary to go beyond the words of the statute to see that bank shareholders are the primary beneficiaries of the statute. Moreover, the legislative history reinforces that observation:

Section 15 would amend Revised Statutes, section 5220 (12 U.S.C. 181), relating to the liquidation of national banks, by adding a requirement that shareholders must approve a purchase and sale agreement if any part of the liquidation is to be accomplished by the sale of any of the bank's assets, but excusing the need for such a vote if in an emergency the Comptroller specifically waives it. Existing law does not require shareholder approval of any agreement the directors make for a bulk sale of bank assets to another bank as a preliminary step to voting the selling bank into voluntary liquidation. This new provision would provide for a shareholder vote in such cases, except in emergencies. . . .

S.Rep. No. 730, 86th Cong., 1st Sess. 4–5, *reprinted in* 1959, *U.S.Code Cong. & Ad.News* 2232 at 2236. *See also Minichello v. Saxon*, 337 F.2d 75, 82 (3d Cir. 1964), *cert. denied*, 380 U.S. 952, 85 S.Ct. 1084, 13 L.Ed.2d 969 (1965) and, *on remand*, 266 F.Supp. 279 (M.D.Pa. 1967), *aff'd* 394 F.2d 715 (3d Cir.), *cert. denied*, 393 U.S. 849, 89 S.Ct. 137, 21 L.Ed.2d 120 (1968) ("The 1959 statute resulted from a belief on the part of Congress that shareholders to that time had not had effective control over the execution of bulk sale agreements made in contemplation of liquidation").

ler's determination of an emergency under 12 U.S.C. § 1828(c).

b

Finally, we reach the question of whether plaintiffs' challenge to the Comptroller's determination of an emergency is within the zone of interests protected by the Wisconsin emergency branch banking statute, Wis. Stat. § 221.04(1)(j)2. Wisconsin branch banking law is relevant to the Midland transaction because, according to federal banking laws, the Comptroller may not approve a branch of a national bank unless state law prerequisites to branching are satisfied. 12 U.S.C. § 36(c).

In Wisconsin, branch banking is forbidden, except as provided by statute. Wis. Stat. § 221.04(1)(f). One statutory provision allows branch banking in a "bankless community." Wis.Stat. § 221.04(1)(j)1. This statute allows a bank to establish a branch in a municipality that has no bank or branch bank only if there is no bank or branch bank within three miles of the proposed branch and if the home bank is in the same county as the branch, or is in a contiguous county and within 25 miles of the branch.[16] Wis.Stat. § 221.04(1)(j)2 provides an exception to § 221.04(1)(j)1 in emergencies.

2. The limits set forth in subd. 1 may not apply to any emergency situation where the commissioner finds that a bank is failing and that it must be merged or consolidated with another bank and operated as a branch bank for the protection of the depositors of the failing bank and that the opportunity to merge or consoli-

date with the bank has been offered to and not accepted by all other banks within the geographical limits of subd. 1.

██ It is important to distinguish the zone of interests protected by the emergency branch banking statute, § 221.04(1)(j)2, from the zone of interests protected by the ordinary branch banking restrictions, § 221.04(1)(f), (i), (j)1, and (1). Although plaintiffs do fall within the zone of interests of the ordinary, non-emergency branch banking provisions, we find that plaintiffs do *not* fall within the zone of interests protected by the Wisconsin emergency branch banking statute.

Competitors of a proposed branch generally are considered to be within the zone of interests of state laws restricting branch banking, which are made applicable to national banks by 12 U.S.C. § 36(c). The purpose of 12 U.S.C. § 36(c) is to place national and state banks on a basis of "competitive equality" with respect to branch banking. *First Nat'l Bank of Logan v. Walker Bank & Trust Co.*, 385 U.S. 252, 261, 87 S.Ct. 492, 497, 17 L.Ed.2d 343 (1966). Thus, both state and national banks that would compete with a proposed branch of a national bank are protected by 12 U.S.C. § 36(c) from illegally authorized competition.[17] In fact, in many cases where the Comptroller's approval of an allegedly illegal branch is challenged by a competitor, standing is simply assumed. *See, e. g., State Bank of Rensselaer v. Heimann*, 619 F.2d 679 (7th Cir. 1980); *First Union Bank & Trust Co. of Winamac v. Heimann*, 600

16. Wis.Stat. § 221.04(1)(j)1 provides that a bank has the power:

To establish and maintain a branch bank, upon approval by the commissioner and the banking review board, in a municipality other than that in which the home bank is located, if such municipality has no bank or branch bank at the time of application and if no bank or branch bank is located within a radius of 3 miles from the proposed site of the branch; however, such 3-mile limitation shall be computed by measuring the street or road mileage of that route which the commissioner and board find would be ordinarily and customarily traveled as the shortest distance between such bank or branch bank and the

proposed site of the branch. A branch bank established under this paragraph shall be located in the same county in which the home bank is located or in a contiguous county if the location of such branch bank is no more than 25 miles from the bank. . . .

17. Indeed, competing banks are more clearly within the zone of interests of the relevant statutes regulating branch banking than the non-bank competitors that challenged allegedly unlawful competition from national banks in *Data Processing, Arnold Tours*, and *Investment Co. Institute*. Yet all of these interests were found to be within the zone of interests protected by the relevant banking laws.

F.2d 91 (7th Cir.), *cert. denied*, 444 U.S. 950, 100 S.Ct. 493, 62 L.Ed.2d 320 (1979); *First Nat'l Bank of Crown Point v. Camp*, 463 F.2d 595 (7th Cir. 1972); *Marion Nat'l Bank v. Van Buren Bank*, 418 F.2d 121, 123 (7th Cir. 1969).[18]

■ The Wisconsin emergency statute, however, provides on its face that the decision that a bank is failing and must be operated as a branch of another bank is made "for the protection of *depositors*" (emphasis added). This language seems to indicate that competing banks are not within the zone of interests protected by the emergency branch banking statute. Attempting to avoid the clear statutory pronouncement, plaintiffs argue that, although the emergency procedures are meant to protect depositors of a failing bank, the threshold decision that the bank is failing may be challenged by competitors if that decision results in establishment of a branch

bank that would be illegal in the absence of a failing bank emergency. The problem with plaintiffs' argument is that the emergency provision, in carving out an exception to the Wisconsin branch banking provisions, also carves out competitors' standing to challenge the application of the exception.

There are no Wisconsin cases discussing the zone of interests protected by the emergency branch provision,[19] but the provision is comparable to the emergency provisions in federal banking laws discussed earlier, 12 U.S.C. §§ 181 and 1828(c). The purpose of both the Wisconsin and federal emergency banking provisions is to restructure the assets and liabilities of a failing bank with a minimum of disruption of services to depositors. If other banks were allowed to challenge the Comptroller's determination of an emergency solely on the basis of their status as competitors, the objectives justifying these emergency procedures could be

---

**18.** In *Marion Nat'l Bank*, the court briefly mentioned the standing question:

> Plaintiffs brought this action. The Van Buren Bank stipulated to their standing. The comptroller did not, but has not seriously contested it on appeal.

418 F.2d at 123. Other circuits and district courts which have explicitly considered the issue have found standing for competitors. *See, e. g., National State Bank of Elizabeth v. Smith*, 591 F.2d 223, 228 (3d Cir. 1979); *First Nat'l Bank of Smithfield v. Saxon*, 352 F.2d 267, 272 (4th Cir. 1965), *aff'd*, 385 U.S. 252, 87 S.Ct. 492, 17 L.Ed.2d 343 (1966); *Mid-West Nat'l Bank of Lake Forest v. Comptroller*, 296 F.Supp. 1223, 1226 (N.D.Ill.1968).

**19.** In *First Nat'l Bank of Wisconsin Rapids v. M & I Peoples Bank of Coloma*, 95 Wis.2d 303, 290 N.W.2d 321 (1980), the Wisconsin Supreme Court discussed the zone of interests of the "bankless community" exception to the prohibition against branch banking, § 221.04(1)(j)1. In *Coloma*, a competing bank challenged the approval of an application to establish a branch bank. Plaintiff claimed that the branch bank would be more than 25 miles from the home bank, in violation of § 221.04(1)(j)1. The court held that plaintiff had alleged sufficient injury, but held, without any discussion of the statutory scheme or legislative history, that "the requirement of sec. 221.04(1)(j)1, Stats., that a branch be no more than 25 miles from the home bank (if in a contiguous county), does not evince an intent to protect competitors." 290 N.W.2d at 327. The significance of the court's conclusion is questionable, since the court proceeded with an extensive analysis of plaintiff's

standing pursuant to Wisconsin's quo warranto statute, Wis.Stat. § 294.04(2). The court held that the quo warranto statute explicitly granted competitor standing. Therefore, plaintiff had standing to bring the quo warranto action even in the absence of a statutory purpose to protect against competitive injury. In a footnote, the court acknowledged that its conclusion regarding standing to protect a competitive interest was contrary to many federal decisions, but declined to clarify the issue because standing clearly was proper under the quo warranto statute. 290 N.W.2d at 327 n.6.

Plaintiffs argue that the Administrative Procedure Act ("APA") authorizes plaintiffs' standing here just as the quo warranto statute did in *Coloma*. But the APA does not by itself confer standing. 5 U.S.C. § 702 confers standing on persons "adversely affected or aggrieved by agency action *within the meaning of a relevant statute*" (emphasis added). Thus, plaintiffs must be within the zone of interests protected by a "relevant statute" other than the APA.

We find that the *Coloma* decision does not resolve the question of the zone of interests of the emergency branch banking statute. The bare statement in *Coloma* that the 25 mile limit does not evince an intent to protect competitors does not aid interpretation of other parts of the Wisconsin branch banking statutes. Therefore, we do not rely on *Coloma* in our discussion of the zone of interests protected by Wisconsin's emergency branch banking statute, § 221.04(1)(j)2.

thwarted by the purely selfish desires of competitors to keep a new competitor out of the local banking community.

In addition to evincing an intent to protect depositors of a failing bank, § 221.04(1)(j)2 provides that when an emergency requires lifting the general prohibitions against branch banking, banks within the geographical limits of § 221.04(1)(j)1 must be offered the opportunity to merge or consolidate with the failing bank. Consequently, we must examine § 221.04(1)(j)1 to determine: (1) the meaning of the "geographical limits" referred to in § 221.04(1)(j)2 and (2) whether plaintiffs fit within those geographical limits.

What is meant by the geographical limits of § 221.04(1)(j)1 is not entirely clear from the face of § 221.04(1)(j)1. But we interpret [20] the phrase "banks within the geographical limits" to encompass those banks that meet all the limitations of § 221.04(1)(j)1 and, therefore, could have acquired the failing bank as a branch, pursuant to § 221.04(1)(j)1, even without an emergency. This interpretation thus entails geographical limitations on the failing bank, as well as on the acquiring bank. In other words, for the "offer" requirement to apply, the failing bank must be the only bank or branch bank in its municipality; there must be no bank or branch bank within three miles of the failing bank; and the acquiring bank must be either in the same county or in a contiguous county and within 25 miles of the failing bank. Only the banks within those geographical limits are entitled to an offer pursuant to § 221.04(1)(j)2.

The "offer" provision is an attempt to minimize the exceptions to the general rule on branching. The "offer" provision evinces an intent to have, whenever possible, even in an emergency, a branch bank/home bank relation that would be otherwise allowable under § 221.04(1)(j)1. We find that only a bank which meets the geographical requirements and which, therefore, could have operated the failing bank as a branch bank, comes within the zone of interests protected by the emergency branch banking statute's "offer" provision. Thus, only a bank which is entitled to an offer under the statute has standing to challenge the determination of an emergency.

The former Midland facility and plaintiffs' banks are all in Milwaukee and are within a one mile radius of each other. Thus, none of the plaintiffs could have qualified under § 221.04(1)(j)1 to acquire Midland as a branch. Since plaintiffs are not within the geographical limits of § 221.04(1)(j)1, they do not have standing to challenge the Comptroller's determination that Midland's condition warranted waiver of the usual geographical restrictions on branch banking. Consequently, even though plaintiffs are within the zone of interests of the ordinary branch banking statute, they are not within the zone of interests protected by Wisconsin's emergency branch banking statute.

Plaintiffs argue, however, that they have a clear interest in the determination of an emergency since they are injured by the illegal competition that results from an erroneous determination of an emergency. But, as discussed earlier in this opinion, competitive injury alone does not confer standing; the zone of interests test must also be met. The sound policy reasons for requiring satisfaction of the zone of interests test are particularly applicable to challenges based on statutes authorizing emergency action by administrative agencies.

The emergency provisions allow the Comptroller to act quickly to save a failing bank. Intervention by competing banks could only hamper this effort by causing

---

**20.** Although "the federal statute has incorporated by reference the limitations which state law places on branch banking activities by state banks," *First National Bank in Plant City v. Dickinson*, 396 U.S. 122, 131, 90 S.Ct. 337, 342, 24 L.Ed.2d 312 (1969), the interpretation of those incorporated statutes is a matter of federal law. *First National Bank of Fairbanks v. Camp*, 465 F.2d 586 (D.C.Cir.1972), *cert. denied*, 409 U.S. 1124, 93 S.Ct. 936, 35 L.Ed.2d 255 (1973).

delay and possibly needless exposure of the failing bank's condition. Such delay and exposure may alarm depositors of the failing bank and may undermine public confidence in the banking system as a whole. The determination that a bank is failing should involve only the failing bank, its depositors and shareholders, and the Comptroller. Competitor banks are strangers to the failure determination, even though their competitive interests might be affected by eventual Comptroller action. We agree with Professor Stewart's analysis:

> Even in the strongest case for expansive standing—where the agency acts in flat violation of the governing statute—a stranger should not be permitted to challenge agency action.... The abstract concern for vindicating the bare words of statutes seems too attenuated a justification for disturbing mutually satisfactory arrangements struck by all of the relevant public and private interests. Accordingly, even in the case of plain statutory violations, we should view officials as bearing duties solely to the various interests which the legislature had recognized as entitled to consideration.

Stewart, *Reformation of Administrative Law*, 88 Harv.L.Rev. 1667, 1736 (1975). Thus, we conclude that the risk of an erroneous determination of an emergency, and subsequent approval of an illegal branch, does not justify allowing competing banks to disrupt the mechanisms for dealing with failing banks.

### 2

In Count II of their amended complaint, plaintiffs allege that even if an emergency existed at Midland, the Comptroller violated § 221.04(1)(j)2 by failing to offer to plaintiffs the opportunity to acquire Midland. But, as just discussed, plaintiffs are not within the geographical limitations of § 221.04(1)(j)1. Only those banks within the geographical limits of § 221.04(1)(j)1 are entitled to be offered the opportunity to purchase the failing bank and, consequently, have standing to contest the Comptroller's failure to offer them that opportunity. Therefore, plaintiffs lack standing to contest the failure to give them an offer.

In summary, we hold that plaintiffs do not have standing to assert the branch banking claims contained in Counts I and II of their amended complaint. Plaintiffs are not within the zone of interests sought to be protected by the relevant statutes. Therefore, the district court's dismissal of these claims is affirmed.

### III

In addition to the branch banking claims, plaintiffs alleged in their original complaint that the Comptroller had violated the Bank Holding Company Act ("BHCA") by failing to obtain prior approval of the Midland acquisition from the Board of Governors of the Federal Reserve System ("Board"). Plaintiffs argued that the purchase of Midland by First Bank was, in reality, a purchase by First Bank System, a bank holding company and, consequently, required the approval of the Board. The district court dismissed this claim on the ground that it lacked jurisdiction.

In order to purchase a bank, a bank holding company must obtain Board approval. 12 U.S.C. § 1842(a). Pursuant to 12 U.S.C. § 1842(d)(1), the Board may approve a bank holding company's purchase of assets of a bank outside the state in which total deposits of the bank holding company's banking subsidiaries are largest only if acquisition of such assets of a bank by an out-of-state bank holding company is specifically authorized by the statute laws of the state in which the bank is located.[21] Plaintiffs ar-

---

**21.** 12 U.S.C. § 1842(d)(1) provides:

Notwithstanding any other provision of this section, no application shall be approved under this section which will permit any bank holding company or any subsidiary thereof to acquire, directly or indirectly, any voting shares of, interest in, or all or substantially all of the assets of any additional bank located outside of the State in which the operations of such bank holding company's banking subsidiaries were principally conducted on July 1, 1966, or the date on which such company became a bank holding company, whichever is later, unless the acquisition of

gue that since (1) Minnesota is the state where the total deposits of First Bank System's banking subsidiaries are greatest and (2) Wisconsin statutes do not permit the acquisition of banks located in Wisconsin by bank holding companies outside of Wisconsin, First Bank System could not acquire Midland directly. Thus, the purported acquisition of Midland by First Bank was, plaintiffs argue, a sham perpetrated by First Bank System in order to evade the prohibitions of 12 U.S.C. § 1842(d).[22]

■ Initially, we note that the restrictions in § 1842(d) do not, on their face, apply here. Pursuant to 12 U.S.C. § 1842(a)(4), prior Board approval is only necessary "for any bank holding company or subsidiary thereof, *other than a bank*, to acquire all or substantially all of the assets of a bank" (emphasis added).[23] Since the transaction at issue was a purchase of the assets of a bank (Midland) by another *bank* (First Bank), not by a bank holding company, under the literal language of the statute, no application for approval from the Board was required. *See Leuthold v. Camp*, 273 F.Supp. 695, 702 (D.Mont.1967), aff'd, 405 F.2d 499 (9th Cir. 1969); *South Dakota v. Nat'l Bank of South Dakota*, 335 F.2d 444, 448–49 (8th Cir. 1964), *cert. denied*, 379 U.S. 970, 85 S.Ct. 667, 13 L.Ed.2d

562 (1965) ("The words in the statute 'other than a bank' clearly show the intention of Congress not to require a bank acquiring the assets of another bank to obtain Board approval").

But, plaintiffs argue that regardless of the exception in 12 U.S.C. § 1842(a)(4) to the requirement of Board approval, the Comptroller should have recognized that he had no jurisdiction to approve the Midland purchase because First Bank System, not First Bank, was the true purchaser of Midland. In other words, plaintiffs argue that we should "pierce the corporate veil" in order to prevent defendants from subverting the Congressional purpose behind § 1842(d).

■ Defendants argue that the Comptroller does not have jurisdiction to determine whether the BHCA has been violated. They argue that any challenge to a transaction under the BHCA must be presented to the Board, whose decisions may be reviewed only in an appropriate court of appeals pursuant to 12 U.S.C. § 1848. Therefore, defendants conclude, and the district court agreed, that the district court lacks jurisdiction to decide the merits of plaintiffs' claim that the Midland acquisition was a BHCA violation. We agree. Plaintiffs may bring

such shares or assets of a State bank by an out-of-State bank holding company is specifically authorized by the statute laws of the State in which such bank is located, by language to that effect and not merely by implication. For the purposes of this section, the State in which the operations of a bank holding company's subsidiaries are principally conducted is that State in which total deposits of all such banking subsidiaries are largest.

**22.** In support of their charges, plaintiffs allege that as of June, 1977, Midland had total assets of approximately $403,000,000, while First Bank had total deposits, as of December, 1976, of only $54,400,000. Plaintiffs argue that in view of the relative sizes of the banks, in addition to Midland's loan and capital problems, First Bank as an independent entity could not have acquired Midland or have provided the additional capital which the Comptroller had required Midland to obtain.

First Bank System, on the other hand, as of June, 1977, had total assets in excess of

$7,900,000,000. In addition, in connection with the acquisition of Midland, First Bank System unconditionally guaranteed the performance of all obligations of First Bank under the purchase agreement with Midland; First Bank System provided $10,000,000 of additional capital to First Bank by purchasing additional common stock of First Bank; First Bank changed its name from "The National Bank of Wisconsin in LaCrosse" to reflect its affiliation with First Bank System; and defendants engaged in an extensive public advertising campaign describing the transaction in terms of Midland becoming "part of First Bank System."

**23.** Section 1842(a)(4) constitutes an allocation of agency responsibility between the Comptroller and the Board. Acquisition of a bank by a bank subsidiary of a bank holding company must be approved by the Comptroller under the Bank Merger Act, while acquisition of a bank directly by a bank holding company must be approved by the Board under the Bank Holding Company Act.

a BHCA claim only before the Board.[24] They may not present their BHCA claim in the guise of a challenge to the Comptroller's discretion and authority.

The leading case in this confusing area of allocation of authority between the Comptroller and the Board, with review in the district court or court of appeals respectively, is *Whitney Nat'l Bank v. Bank of New Orleans*, 379 U.S. 411, 85 S.Ct. 551, 13 L.Ed.2d 386 (1965). In *Whitney*, a national bank in Louisiana wished to expand its operations through a new bank, but state branch banking law prohibited operation of a branch beyond its home parish. The bank attempted to solve its problem by organizing a bank holding company. The existing bank was to be merged into the holding company, which, in turn, would organize two banks, one consisting of the existing bank and the other consisting of the new bank in the neighboring parish. The net result was that the stockholders of the original bank would own the holding company, which in turn would own and operate both the original and new banks. The Board approved the plan over the objection of competing banks. The competitors sought

judicial review of the Board's decision in the Fifth Circuit Court of Appeals, pursuant to 12 U.S.C. § 1848.

Meanwhile, after the Board's approval of the plan, but before the filing of the suit in the court of appeals for review of the Board's decision, the competing banks filed a declaratory judgment action in the District of Columbia District Court. The competitors sought a declaration that the Comptroller had no power to grant the necessary certificate of authority for the proposed new bank because the bank holding company arrangement violated the BHCA. In that suit, both the district court and the District of Columbia Circuit Court of Appeals held that the new bank would be an illegal branch of the original bank. Consequently, the Comptroller was enjoined from issuing the certificate of authority to the new bank. As a result, the Board's order was essentially overruled by the action against the Comptroller.

The Supreme Court reversed, holding that since the BHCA gives the Board exclusive jurisdiction to approve bank holding company arrangements,[25] re-

---

**24.** Any party who is a potential competitor has standing to challenge orders of the Board or to intervene in Board proceedings. 12 U.S.C. § 1850. Here, there is no Board order for plaintiffs to challenge. But the "Board order" provision has been interpreted by the Board as permitting a competitor to petition the Board for a formal ruling on an allegation that a bank or bank holding company is violating the BHCA. *See* "In re American Security and Trust Company," 39 Fed.Reg. 40898 (Nov. 21, 1974). Therefore, plaintiffs had an avenue for presenting their argument before the Board.

Plaintiffs argue that it would be futile to attempt to present the issue to the Board because the Board has consistently refused to review this type of transaction. In fact, Marshall & Ilsley informally inquired about the Midland transaction in a letter to the Board. By letter dated August 24, 1977, the Board's Secretary responded as follows:

Although the transition [sic] had the effect of expanding the banking assets of First Bank System, section 3(a)(4) of the Bank Holding Company Act permits a bank subsidiary of a bank holding company to acquire substantially all of the assets of another bank without Board approval under the Bank Holding Company Act. In this case the Comptroller of the Currency approved the

transaction after considering essentially the same factors that would have been considered by the Board of Governors, had the transaction required an application under section 3 of the Act.

We do not believe that the limitations on the expansion of interstate bank holding companies were violated by the acquisition in question. Section 3(d) of the Bank Holding Company Act prohibits expansion of multistate bank holding companies only under circumstances in which Board approval would be required to do so. As pointed out above, no application under the Bank Holding Company Act was necessary in this case.

Plaintiffs' App. at 25. But, the Board's refusal to take any action under the BHCA has no effect upon the district court's jurisdiction, or lack thereof, over an alleged BHCA claim.

**25.** In *Whitney*, as here, both branch banking and BHCA issues were raised. Plaintiffs' chief contention was that the organization of the bank holding company was unlawful because it allowed the formation of the new bank as a virtual branch of the old bank, contrary to state law. Plaintiffs also argued that state law prohibited subsidiaries of bank holding companies from opening. The Court noted that, with re-

view of Board action must be pursued solely as provided in the BHCA—in the appropriate court of appeals. The Court, therefore, ordered the suit involving the Comptroller dismissed.[26] The Court held not only that judicial review of Board action is available only as provided in the BHCA, but also that when the legality of a bank holding company's action is involved, any challenge must be brought initially before the Board. In other words, when Congress set up an exclusive judicial review procedure for Board determinations under the BHCA, it also evinced an intent that the Board always be the initial judge of BHCA issues:

> Here the Court of Appeals held that the relationship of Whitney-Jefferson to Whitney-New Orleans would be that of a branch bank notwithstanding the fact that they were organized under a bank holding company arrangement. The District Court found the proposal barred by Louisiana Act No. 275 of 1962. *We believe that these are the very types of questions that Congress has committed to the Board, and we hold that the Board should make the determination of the plan's propriety in the first instance.* The soundness of this conclusion is especially evident when it is remembered that the Board has played a vital role in the development of the national banking laws, a role which makes its views of particular benefit to the courts where ultimately the validity of the arrangement will be tested.

379 U.S. at 421, 85 S.Ct. at 558 (emphasis added).

Thus, *if* there really was a BHCA issue in this case, it could only be brought before the Board, not as a challenge to the Comptroller's authority to approve the transaction. To hold otherwise would allow a decision regarding the Comptroller's authority to force a particular interpretation of the BHCA on the Board without the issue being presented in the first instance to the Board.[27]

---

spect to both arguments, plaintiffs' "quarrel is in actuality not merely with the opening of the bank, but rather with its opening as a subsidiary of [the bank holding company]." 379 U.S. at 418, 85 S.Ct. at 556.

**26.** The Court also stayed the issuance of its judgment for 60 days in order to allow the parties to return to the Fifth Circuit, which had reviewed the Board's order pursuant to 12 U.S.C. § 1848, to secure a remand to the Board for further consideration of plaintiffs' claims. 379 U.S. at 425, 85 S.Ct. at 560.

**27.** In some situations, it may be necessary for a court, on review of Comptroller action, to make an initial determination of whether a bank holding company is involved, so that Board involvement is appropriate. Although only the Board has jurisdiction to decide the merits of a BHCA issue, if the court finds that there is a substantial BHCA issue, it may be necessary to take action to preserve the issue for Board review. In *American Bank of Tulsa v. Smith*, 503 F.2d 784 (10th Cir. 1974), the court issued a 60 day stay of the Comptroller's issuance of a new bank's certificate of authority to do business in order to allow the parties to present allegations of a BHCA violation to the Board. But in this case, the relief requested is divestiture by First Bank of the assets acquired from Midland almost four years ago, not merely a stay of the Comptroller's proposed action. Therefore, even if we found a substantial BHCA problem, it would be inappropriate to

offer plaintiffs relief similar to that given in *American Bank of Tulsa* pending presentation of the BHCA issue to the Board.

We also note that even if some relief by way of a stay by the court was possible, plaintiffs have not raised a sufficiently substantial BHCA issue to warrant such "extraordinary use of court process." *American Bank of Tulsa*, 503 F.2d at 789. Plaintiffs' allegation of a BHCA violation is exactly like that rejected in *Leuthold v. Camp*, 273 F.Supp. at 702 (D.Mont. 1967), *aff'd*, 405 F.2d 499 (9th Cir. 1969), that "because what is done in terms of real ownership is so like what is prohibited, that what is done likewise should be prohibited." It is true that defendants First Bank and First Bank System took advantage of a "loophole" in the Bank Holding Company Act. But taking advantage of the loophole is not, by itself, enough to justify piercing the corporate veil. As stated by the court in *Leuthold v. Camp*, 273 F.Supp. at 702:

> The Act itself makes formal and perhaps arbitrary distinctions between asset and stock acquisitions, between bank and bank holding company acquisitions. Under these conditions it is the court's opinion that it should not, by disregarding the corporate forms, abolish the distinctions that Congress created.

*See also South Dakota v. Nat'l Bank of South Dakota*, 335 F.2d at 448–49 (8th Cir. 1964), *cert. denied*, 379 U.S. 970, 85 S.Ct. 667, 13 L.Ed.2d 562 (1965).

## IV

For the foregoing reasons we find that the district court correctly dismissed both plaintiffs' original and amended complaints. The district court's judgment, therefore, is

AFFIRMED.